**Docket No. 23-11146**

IN THE

UNITED STATES COURT OF APPEALS

ELEVENTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Appellee,<br><br>v.<br><br>JEREMY BROWN,<br><br>    Appellant. | Direct Criminal Appeal<br>Middle District of Florida<br>Lower Case No. 8:21-cr-348-SCB-SPF-1 |

**PRINCIPAL BRIEF OF APPELLANT**

MICHAEL UFFERMAN
Michael Ufferman Law Firm, P.A.
2022-1 Raymond Diehl Road
Tallahassee, Florida 32308
(850) 386-2345
FL Bar No. 114227
Email: ufferman@uffermanlaw.com

Counsel for Appellant **BROWN**

## B.  CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The following certificate of interested persons and corporate disclosure statement is provided pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, 26.1-3, and 28-1(b):

Asokan, Risha; Assistant United States Attorney

Brown, Jeremy; Appellant

Bucklew, Susan C.; Senior U.S. District Judge, Middle District of Florida

Corrigan, Timothy J.; Chief U.S. District Judge, Middle District of Florida

Flynn, Sean P.; U.S. Magistrate Judge, Middle District of Florida

Futerman, Roger; Trial counsel for Appellant Brown

Gershow, Holly L.; Assistant United States Attorney, Deputy Chief, Appellate Division

Goedman, Menno; United States Department of Justice

Handberg, Roger B.; United States Attorney

Jewell, Jillian M.; Assistant United States Attorney

Krigsman, Cherie L.; Assistant United States Attorney

Loesch, Melissa A.; Trial counsel for Appellant Brown

Marcet, Daniel J.; Assistant United States Attorney

Nebesky, Suzanne C.; Assistant United States Attorney

Rhodes, David P.; Assistant United States Attorney, Chief, Appellate Division

Sansone, William Fargo; Former trial counsel for Appellant Brown

Ufferman, Michael; Appellate counsel for Appellant Brown

I hereby certify that no publicly traded company or corporation has an interest in the outcome of this appeal.

## C.  STATEMENT REGARDING ORAL ARGUMENT

This case presents three important constitutional questions.  First, the Appellant, Jeremy Brown (hereinafter "Appellant Brown"), submits that the warrant in this case violates the "particularity" requirement of the Fourth Amendment because it failed to identify any of the items to be seized.  Second, Appellant Brown asserts that 26 U.S.C. § 5861(d) – which punishes, as a felony, possession of an unregistered shotgun/rifle having a short barrel – is a facially unconstitutional restriction on a person's Second Amendment right to bear arms.  And third, Appellant Brown contends that the holding in *Doyle v. Ohio*, 426 U.S. 610 (1976) – where the Supreme Court held that the prosecution's use of post-arrest silence violates the Constitution – prohibited the Government from commenting on Appellant Brown's "silence" during his recorded jail call with his girlfriend.  This Court should grant oral argument to consider these constitutional questions.

## D.  TABLE OF CONTENTS

Page

A.    TITLE PAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

B.    CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
      DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

C.    STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . .  iv

D.    TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

E.    TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

      1.    Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

      2.    Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ix

      3.    Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

F.    JURISDICTIONAL STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

G.    STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

H.    STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.    Course of the Proceedings and Disposition Below. . . . . . . . . . . . . 3

      2.    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      3.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

J.    ARGUMENT AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . 11

      1.    The district court erred by denying Appellant Brown's motion to
            suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

a.  Factual and procedural history . . . . . . . . . . . . . . . . . . . . . . . . 12

b.  The warrant used to search Appellant Brown's property lacked "particularity" and was therefore facially invalid (or, alternatively, the warrant did not authorize law enforcement officials to seize the numerous items that were seized when the search warrant was executed on September 30, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

c.  The magistrate judge in the District of Columbia lacked jurisdiction to issue a search warrant for Appellant Brown's residence and property in the Middle District of Florida . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

d.  The affidavit was based on stale information . . . . . . . . . . . . 24

e.  The district court erred by denying Appellant Brown's request for a *Franks* hearing . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.  26 U.S.C. § 5861(d) – which punishes, as a felony, possession of an unregistered shotgun/rifle having a short barrel – is a facially unconstitutional restriction on a person's Second Amendment right to bear arms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

3.  The Government erroneously commented on Appellant Brown's silence in a recorded conversation. . . . . . . . . . . . . . . . . . . . . . . . . . 46

K.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

L.  CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . 52

M.  CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## E.  TABLE OF CITATIONS

Page

### 1.    Cases

*Andresen v. Maryland*, 427 U.S. 463 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Andrews v. Scuilli*, 853 F.3d 690 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Boyd v. United States*, 116 U.S. 616 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) . . . . . . . . . . . . . . . . . . . . . . . 15

*DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 31

*District of Columbia v. Heller*, 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . *passim*

*Doyle v. Ohio*, 426 U.S. 610 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Franks v. Delaware*, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . 9, 29-30, 32

*Groh v. Ramirez*, 540 U.S. 551 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18

*Hoffman v. United States*, 341 U.S. 479 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In re Search of One Apple iPhone Smartphone*,
      628 F. Supp. 3d. 155 (D.D.C. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

*Johnson v. United States*, 333 U.S. 10 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) . . . . . . . . . . . . . . . . . . . . . . 35

*Malloy v. Hogan*, 378 U.S. 1 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Maness v. Meyers*, 419 U.S. 449 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*McDonald v. Chicago*, 561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

*McDonald v. United States*, 335 U.S. 451 (1948) . . . . . . . . . . . . . . . . . . . . . . . . 17

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Payton v. New York*, 445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*People v. Eshelman*, 225 Cal. App. 3d 1513 (Cal. Ct. App. 1990) . . . . . . . . . . . 49

*People v. Hollinquest*, 190 Cal. App. 4th 1534 (Cal. Ct. App. 2010) . . . . . . . . . 49

*People v. Medina*, 51 Cal. 3d 870 (Cal. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Quinn v. United States*, 349 U.S. 155 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Scott v. Diaz*, 2016 WL 8969577 (C.D. Cal. Dec. 16, 2016). . . . . . . . . . . . . . 48-49

*Stone v. United States*, 258 Fed. Appx. 784 (6th Cir. 2007) . . . . . . . . . . . . . . . . 48

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Accardo*, 749 F.2d 1477 (11th Cir. 1985) . . . . . . . . . . . . . . . . . 15

*United States v. Bervaldi*, 226 F.3d 1256 (11th Cir. 2000) . . . . . . . . . . . . . . . . . 25

*United States v. Brundidge*, 170 F.3d 1350 (11th Cir. 1999) . . . . . . . . . . . . . . . 25

*United States v. Bullock*, 2023 WL 4232309 (W.D. La. Jun. 28, 2023) . . . . . . . 40

*United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . 24

*United States v. Crabtree*, 77 F. Supp. 3d 1192 (S.D. Ala. 2015). . . . . . . . . . . . 18

*United States v. Grant*, 682 F.3d 827 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . 27-28

*United States v. Harper*, 2023 WL 5672311 (M.D. Penn. Sept. 1, 2023). . . . . . 40

*United States v. Harris*, 20 F.3d 445 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . 26-27

*United States v. Jenkins*, 901 F.2d 1075 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . 15

*United States v. Jiminez*, 224 F.3d 1243 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . 25

*United States v. Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . 18, 27, 29

*United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002) . . . . . . . . . . . . . . . 24, 26

*United States v. Miller*, case number 3:23-CR-00041 (N.D. Tex.) . . . . . . . . . . . 33

*United States v. Miller*, 307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Paige*, 604 F.3d 1268 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 8

*United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023) . . . . . . . . . . . . . . . . . . 39-40

*United States v. Ramirez*, 476 F.3d 1231 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . 7

*United States v. Taylor*, 935 F.3d 1279 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . 27

*United States v. Wuagneux*, 683 F.2d 1343 (11th Cir. 1982) . . . . . . . . . . . . . . . 15

## 2.    Statutes

18 U.S.C. § 231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

18 U.S.C. § 793(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

18 U.S.C. § 842(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

18 U.S.C. § 844 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 844(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

18 U.S.C. § 922(g)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-40

18 U.S.C. § 1752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 1752(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 22

18 U.S.C. § 1752(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 22

18 U.S.C. § 2331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 2331(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21, 23

18 U.S.C. § 2331(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 2331(5)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

26 U.S.C. § 5811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

26 U.S.C. § 5812 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

26 U.S.C. § 5821 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

26 U.S.C. § 5822 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

26 U.S.C. § 5841(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

26 U.S.C. § 5845(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

26 U.S.C. § 5861(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 U.S.C. § 5871 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii, 37

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

**3.    Other**

11th Cir. R. 26.1-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 26.1-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 26.1-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 28-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 28-1(i)(*i*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11th Cir. R. 28-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

4 W. Blackstone, *Commentaries on the Laws of England* (1769) . . . . . . . . . . . 42

Fed. R. App. P. 26.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Fed. R. App. P. 28(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Fed. R. App. P. 28(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Fed. R. App. P. 28(a)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Fed. R. App. P. 28(a)(4)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Fed. R. App. P. 32(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Fed. R. Crim. P. 41(a)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Crim. P. 41(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22-24, 27

Fed. R. Crim. P. 52(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

The Federalist No. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

George C. Neumann,
    *The History of Weapons of the American Revolution* (1967) . . . . . . . . . . 42

U.S. Const. amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 50

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 48, 50

## F. JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231 for a criminal prosecution of "offenses against the laws of the United States."  The Government prosecuted Appellant Brown under 26 U.S.C. §§ 5861(d) and 5871; 18 U.S.C. §§ 842(j) and 844(b); and 18 U.S.C. § 793(e).  (Doc 250).[1]  *See* Fed. R. App. P. 28(a)(4)(A).

This Court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal of a "final decision" by the district court.  *See* Fed. R. App. 28(a)(4)(B), (D).

The judgment was filed on April 7, 2023.  (Doc 357).  The notice of appeal was timely filed on April 9, 2023.  (Doc 360).  *See* Fed. R. App. 4(b), 28(a)(4)(C).

---

[1] Record citations are to the document and, if necessary, to the page number of the document or the exhibit attached to the document (and for the transcripts, the citation is to the page number assigned by the court reporter).  *See* 11th Cir. R. 28-5.

## G.  STATEMENT OF THE ISSUES

1.      The district court erred by denying Appellant Brown's motion to suppress.

2.      26 U.S.C. § 5861(d) – which punishes, as a felony, possession of an unregistered shotgun/rifle having a short barrel – is a facially unconstitutional restriction on a person's Second Amendment right to bear arms.

3.      The Government erroneously commented on Appellant Brown's silence in a recorded conversation.

## H.  STATEMENT OF THE CASE

Appellant Brown is a retired twenty-year United States Army Special Operations soldier.  (Doc 364, at 8).  He previously served our country with the 75th Ranger Regiment and Special Forces Regiment (Green Berets).  (Doc 364, at 8-9).  During multiple combat tours over his career, he received two Bronze Star Medals, as well numerous other awards.  (Doc 364, at 9).

On January 6, 2021, Appellant Brown attended a "Stop the Steal" rally at the United States Capitol building in Washington, D.C.  Approximately nine months later (on September 29, 2021), a criminal complaint was submitted to a magistrate judge in the District of Columbia alleging that on January 6, 2021, Appellant Brown committed a misdemeanor trespass in violation of 18 U.S.C. § 1752(a)(1) and misdemeanor disorderly and disruptive conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2).  Those charges remain pending today.

On that same day, a different magistrate judge in the District of Columbia issued a search warrant for Appellant Brown's property in Tampa, Florida.  The warrant was executed on September 30, 2021, and the items seized during that search formed the basis for the charges in this case (i.e., possession of an unregistered shotgun having a barrel less than 18 inches, possession of an unregistered rifle having a barrel less than 16 inches, possession of unregistered explosive grenades, improper storage of explosive material (two grenades), and willful retention of a national

2

defense document.

The convictions should be reversed because, among other reasons, the warrant failed to identify any of the items to be seized, 26 U.S.C. § 5861(d) is a facially unconstitutional restriction on a person's Second Amendment right to bear arms, and the Government erroneously commented on Appellant Brown's "silence" during his recorded jail call with his girlfriend.

**1.    Course of the Proceedings and Disposition Below**

Appellant Brown – who is presently incarcerated (11th Cir. Rule 28-1(i)(*i*)) – was indicted for:

- Count One – possession of an unregistered shotgun having a barrel less than 18 inches

- Count Two – possession of an unregistered rifle having a barrel less than 16 inches

- Counts Three and Four – possession of unregistered explosive grenades

- Count Five – improper storage of explosive material (two grenades)

- Counts Six-Ten – willful retention of a national defense document[2]

(Doc 250).

---

[2] The documents that formed the basis for Counts Six-Nine were found on a CD when Appellant Brown's property was searched.  Count Ten is a "Trip Report" authored by Appellant Brown.

The jury found Appellant Brown not guilty of Counts Six-Nine and guilty of Counts One-Five and Ten.  (Doc 305).  For Counts One-Four and Ten, the district court sentenced Appellant Brown to eighty-seven months' imprisonment, with the sentences to run concurrently.  (Doc 357).  For Count Five, the district court sentenced Appellant Brown to "Time Served."  (Doc 357).

### 2.    Statement of the Facts

At trial, the Government's theory was that Appellant Brown possessed the items that formed the basis for the charges in this case, and the Government presented witnesses explaining where the items were found and the nature of the items.  At trial, Appellant Brown testified and he admitted that he possessed the firearms that formed the basis for Counts One and Two.  (Doc 337, at 915).  Appellant Brown also acknowledged that he authored the document that formed the basis for Count Ten (and he testified "I know it wasn't classified because I typed it").  (Doc 337, at 910, 921).  However, as explained by defense counsel below during his opening statement, Appellant Brown's theory of defense was that the items that formed the basis for Counts Three-Nine were planted:

> Members of our jury, the forensic evidence that you will see in this case, including DNA evidence, fiber, textile, hair evidence, will show that Counts 3 through 9 was planted.  Forensics do not lie, as the evidence will show.  People do.  And that's why we're here.
>  . . . .
> During this trial, I'm not going to be able to show you how they

were planted or who planted them, but what I will show you is when Mr. Brown did not play ball with the federal agencies, did not work for them as a confidential, paid informant, did not give them information, instead went on various media outlets, criticizing them, naming agents, chastising them, bad things happen.

Take you back to December of 2020. Agent Lindsey . . . and Agent Ura approached Mr. Brown. Mr. Brown recorded that conversation . . . . And they are asking Mr. Brown about a variety of subjects. Number one, would he be a paid informant for the government to infiltrate some groups they were looking at and some concerns they had about January. You know what happened January 6th, 2021.

He recorded that conversation. . . . [And] instead of working for the government on January 6th . . . , he went on to different media outlets, starting in March of 2021, playing that recording, naming the agents, exposing what they wanted him to do, naming it document and naming subjects, such as criticizing the government, exposing the government.

He continued to do that beyond March, June on different media outlets, giving interviews about those interactions and being very critical of the agents . . . .

Lo and behold, come September of 2021, a whole team of agents show up at Mr. Brown's residence . . . .

. . . .

And you'll hear about a whole series of oddities. Let me tell you about the first oddity that gives credence to why this evidence was planted. The first thing the agents do when they get there and they go into the house, is they turn off all the 14 recording devices, the cameras. In this age of transparency, they turn off all the cameras. . . . [Y]ou'll hear that none of the agents had any functioning body camera, neither the local police, none of the federal agencies. . . .

. . . .

The only person that was recording the initial interaction was his girlfriend that he was living with, Tylene Aldridge, who recorded the interaction, recorded the arrest by Agent Lindsey and Mr. Ura. And they actually said to turn off the recording, which she did, and then we don't see any more recording. Out of all these agents, nothing caught on camera, by their choice.

They go into an RV, and they go into the house. In the house,

you'll hear about the gun.  Doesn't dispute he owns it.  When they go into the RV and they find these grenades, the government glossed over in opening, is that ultimately Mr. Brown, who absolutely denied knowing possession of these grenades, these grenades were sent for DNA evidence to find or seek out if his DNA was on these grenades. The FBI's own laboratory, their own experts . . . will tell you, guess what, there was two male specimen DNAs on those grenades.

And you know who was excluded as one of those males? Jeremy Brown.  Male DNA on the grenades, not Mr. Brown's.

. . . .

They find a animal hair underneath one of these grenades, a dog hair.  Mr. Brown has two dogs. . . .  And they get a search warrant, and they come back and take a whole bunch of samples from the dogs, about over 50 samples to see if the dog fiber that was also found under the grenades matches his dogs.  Not his dogs.  The fiber that comes back, you'll hear from the expert, is a different animal.  His dogs are excluded.

The expert then finds a carpet textile fiber on one of the grenades or the tape around the grenades.  So they get a search warrant. . . .  And they go back to the residence . . . .  They cut out pieces of the carpet from the house.  They cut out fibers from the RV.  They vacuum to get fibers.  The expert then has to compare the fiber that was found underneath the grenade to his fibers.

Guess whose fibers were excluded?  Mr. Brown's.

So we have a carpet textile fiber that the forensics will show on these grenades that don't match any of his carpets, bath mats, textiles. We have an animal, dog fiber that is not his dog's.  And we have two male DNA that's not him.  The forensics don't lie.

. . . .

You'll see through a photographic evidence a series of things that happened, and they go through this briefcase of Mr. Brown where, yes, Count 10 is a document that he fully wanted to be exposed, that he fully admitted was in his possession . . . .

But the classified documents, 6, 7, 8, and 9, were apparently found on a CD, a 17-year old CD that you're going to see in a few minutes.  You're going to see the condition of this CD that apparently Mr. Brown would have had to have gone through the dessert in Kuwait, in Afghanistan, brought into the country, held through the 17 years, you'll see without a scratch on that CD, without a discoloration on that

CD, with a sticker that if he wanted to conceal, because he knew they were coming to visit him that day, could have just peeled off.  You'll see that CD.

And you'll hear that it was in August of 2022, at the defense's request, there was a trace done on that CD to see when it was uploaded.  August of 2022, because he said, hey, I didn't put that CD in my RV.  That is not my CD.  You'll hear, when he testifies, logically, why it also makes sense that he kept the physical document that he authored, and he did not have this CD.

. . . He clearly didn't have that CD.  He couldn't have uploaded that CD.  He didn't upload that CD, and he didn't keep that CD for 17 years.  And when you see the CD in a few minutes, you'll see the condition is totally inconsistent with that . . . .

. . . .

He did not have those CD or those grenades in his knowing possession.  And you'll hear about good reasons how it got there and why it got there.

. . . .

When you hear the forensic evidence and you see the oddities and the photographs . . . . at the end of the case, members of the jury, I respectfully will submit to you that you'll say you had some serious, serious concerns about Counts 3 through 9, and you will very, very quickly find him not guilty of Counts 3 through 9.

(Doc 333, at 190-197).

### 3.    Standard of Review.

Issue 1:  In reviewing the denial of a motion to suppress, this Court reviews the district court's findings of fact for clear error and its application of law to those facts *de novo*.  *See United States v. Ramirez*, 476 F.3d 1231, 1235 (11th Cir. 2007).  All facts are construed in the light most favorable to the prevailing party.  *See id*. at 1235-1236.

7

Issue 2:  This Court reviews *de novo* questions of constitutional law.  *See United States v. Paige*, 604 F.3d 1268, 1274 (11th Cir. 2010).

Issue 3:  Because this issue was not argued below, this Court reviews for plain error.  This Court may reverse if (1) there is an error that: (2) is plain, (3) has affected the defendant's substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *See* Fed. R. Crim. P. 52(b).

# I.  SUMMARY OF ARGUMENT

Appellant Brown raises three claims on appeal.  First, the district court erred by denying Appellant Brown's motion to suppress.  As explained below, (1) the warrant used to search Appellant Brown's property lacked "particularity" and was therefore facially invalid (or, alternatively, the warrant did not authorize law enforcement officials to seize the numerous items that were seized when the search warrant was executed on September 30, 2021); (2) the magistrate judge in the District of Columbia lacked jurisdiction to issue a search warrant for Appellant Brown's residence and property in the Middle District of Florida; (3) the affidavit was based on stale information; and (4) the district court erred by denying Appellant Brown's request for a *Franks*[3] hearing.

Second, 26 U.S.C. § 5861(d) – which punishes, as a felony, possession of an unregistered shotgun/rifle having a short barrel – is a facially unconstitutional restriction on a person's Second Amendment right to bear arms.  Pursuant to the historical-traditional framework set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), requiring a law-abiding citizen to pay a tax and to register a short-barreled shotgun/rifle is unconstitutional because it is not supported by the text, history, or tradition of the Second Amendment.

---

[3] *Franks v. Delaware*, 438 U.S. 154 (1978).

Third, the Government erroneously commented on Appellant Brown's silence in a recorded conversation. During the trial, the Government introduced the recording of a jail call between Appellant Brown and his girlfriend, and during closing arguments, the Government told the jury that Appellant Brown's "silence" during that call was a "confession." In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court held that the prosecution's use of post-arrest silence violates the Due Process Clause of the Fourteenth Amendment to the Constitution.

## J.  ARGUMENT AND CITATIONS OF AUTHORITY

**1.     The district court erred by denying Appellant Brown's motion to suppress.**

The Fourth Amendment to the Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The warrant requirement of the Fourth Amendment guarantees the fundamental right to be free from government intrusion into the privacy of one's home.  *See Payton v. New York*, 445 U.S. 573, 585-586, 589-590 (1980); *Johnson v. United States*, 333 U.S. 10, 13-14 (1948); *Boyd v. United States*, 116 U.S. 616, 630 (1886).

Prior to trial, Appellant Brown moved to suppress all evidence obtained as a result of the September 30, 2021, search of his residence, R.V., trailer, and truck – all of which were located in Tampa, Florida.  (Doc 186).  In the motion to suppress, Appellant Brown asserted that the search warrant issued for his property in the Middle District of Florida was invalid for the following reasons: (1) the magistrate judge in the District of Columbia (the Honorable Zia M. Faruqui) lacked jurisdiction to issue a search warrant for property located in the Middle District of Florida; (2) the search warrant affidavit was based on stale information; and (3) the search warrant application omitted the material facts.  Ultimately, the district court summarily denied

11

(i.e., without first conducting an evidentiary hearing) Appellant Brown's motion to

suppress. (Doc 196). As explained below, the district court erred by denying the

motion to suppress – and each of Appellant Brown's subclaims are addressed in turn

below.

a.    <u>Factual and procedural history</u>

The motion to suppress provided the following "Factual and Procedural

History:"

1.    On January 6, 2021, a joint session of Congress was scheduled at the Capitol building in Washington, D.C. Various supporters of President Trump intended to appear at a "Stop the Steal" rally to protest the results of the election.

2.    Mr. Brown, who served in the United States Army for 20 years, including 17 years in the Special Forces, planned to attend the rally. Mr. Brown reached out to the Oath Keepers organization and let them know he was available to provide security to any other attendee that might require it.

3.    On or about January 4, 2021, Mr. Brown, his girlfriend Tylene Aldridge, and a few other individuals met up in Tampa with the intent to drive in separate vehicles to the area of the Capitol for the rally.

4.    Mr. Brown and his girlfriend drove in an R.V. They parked the R.V. at a R.V. park that was roughly a 40-minute drive to the Capitol. They had two acquaintances drive their van up for them so that they could ride around Washington, D.C. in the van and leave the R.V. at the R.V. park.

5.    Mr. Brown received security credentials from the Oath Keepers and was given permission to be inside a V.I.P. area of the rally. On January 5, 2021, Mr. Brown provided security at the Supreme Court. On January 6, 2021, Mr. Brown attended the rally as planned. He was assigned to protect the mother of a speaker at the rally.

6.    At the rally, protests turned into riots and law enforcement officers and others were assaulted by the rioters. Some of the rioters

pushed their way into the Capitol building.

7.     Mr. Brown remained outside the Capitol building at all times.  There is no evidence that he assaulted anyone, vandalized anything, encouraged others to act unlawfully, or possessed firearms at the rally.

8.     Law enforcement investigated Mr. Brown's presence at the Capitol on January 6, 2021, for nearly nine months thereafter.

9.     Then, on September 29, 2021, Special Agent Hill submitted a criminal complaint against Mr. Brown to the Honorable Robin Meriweather, a magistrate judge in Washington, D.C., alleging that on January 6, 2021, Mr. Brown committed a misdemeanor trespass in violation of 18 U.S.C. § 1752(a)(1) and disorderly and disruptive conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2). These charges were formally filed by Information in 21-MJ-619 on October 1, 2021, and remain pending today.

10.     Also on September 29, 2021, Special Agent Hill submitted a search warrant application to the Honorable Zia Faruqui, a magistrate judge in Washington, D.C., for Mr. Brown's property located in Tampa, Florida.  The property to be searched included Mr. Brown's residence, R.V., black trailer, and personal cell phone.  The Honorable Judge Faruqui issued the search warrant.  *Exhibit A: Search Warrant Application; Exhibit B: Affidavit in Support of Application; Exhibit C: Search Warrant.*

11.     On September 30, 2021, law enforcement arrived at Mr. Brown's residence in Tampa, Florida to arrest him for the misdemeanor offenses and to execute the search warrant on his home, R.V., black trailer, and cell phone.

12.     Mr. Brown was not home when the officers arrived, but he arrived shortly after.  He drove up in his truck and parked in the street outside his home.  He exited his truck and left his cell phone inside.  The officers arrested Mr. Brown without incident on the arrest warrant for the misdemeanor charges.

13.     Even though the truck was not listed as an item to be searched in the search warrant, officers went into the truck parked in the roadway and seized Mr. Brown's cell phone.  Mr. Brown's girlfriend, Ms. Aldridge, was present at the residence while law enforcement was there.  Ms. Aldridge recorded a portion of the officers' activities on her cell phone. *Exhibit D: Cell Phone Video Recording.  Law enforcement seized multiple items during the search.  Exhibit E: Receipt for Property*

13

*Seized.*

(Doc 186, at 2-4).

      b.    <u>The warrant used to search Appellant Brown's property lacked "particularity" and was therefore facially invalid (or, alternatively, the warrant did not authorize law enforcement officials to seize the numerous items that were seized when the search warrant was executed on September 30, 2021)[4]</u>

The search warrant in this case states the following:

To: Any authorized law enforcement officer
      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Middle District of Florida (identify the person or describe the property to be searched and give its location):
      See Attachment A (incorporated by reference)

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, *and that such search will reveal* (*identify the person or describe the property to be seized*):
      See Attachment B (incorporated by reference)

(Doc 189, Ex. C) (emphasis added).[5]   "Attachment A" to the warrant is titled

---

[4] Because this subclaim was not raised in the motion to suppress, this Court reviews for plain error.  This Court may reverse if (1) there is an error that: (2) is plain, (3) has affected the defendant's substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *See* Fed. R. Crim. P. 52(b).

[5] The style of the warrant is "In the Matter of the Search of (Briefly describe the property to be searched or identify the person by name and address) A RESIDENCE LOCATED AT [], A RECREATIONAL VEHICLE [] PARKED AT [], A BLACK TRAILER [], AND A CELL PHONE CURRENTLY BEING USED BY JEREMY BROWN UNDER RULE 41."  (Doc 189, Ex. C).

"PREMISES TO BE SEARCHED" and describes a residence located in Tampa, Florida. (Doc 189, Ex. A). However, "Attachment B" is also titled "PREMISES TO BE SEARCHED" and describes a recreational vehicle parked in Tampa, Florida. (Doc 189, Ex. A). Thus, pursuant to the plain language on the face of the warrant – and the only two attachments that were "incorporated by reference" into the warrant – the only "item to be seized" in this case was a recreational vehicle. The warrant did *not* authorize law enforcement officials to seize the numerous items that were seized when the search warrant was executed on September 30, 2021 (i.e., firearms, grenades, and documents – the items that formed the basis for the charges in this case).

A warrant must describe with particularity the place to be searched and the items or persons to be seized in order to satisfy the Fourth Amendment. *See United States v. Jenkins*, 901 F.2d 1075, 1081 (11th Cir. 1990). The purpose of this "particularity requirement" is to prevent "general, exploratory rummaging in a person's belongings." *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (quotation marks and citation omitted). General warrants violate the Fourth Amendment because they essentially authorize "a general exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). A warrant that fails to particularize the things to be seized is thus facially deficient. *See United States v. Accardo*, 749 F.2d 1477, 1481 (11th Cir. 1985).

15

In support of his argument, Appellant Brown relies on *Groh v. Ramirez*, 540 U.S. 551 (2004). In *Groh*, federal agents applied for a warrant to search a ranch in Montana for weapons and explosives. *See id.* at 553. The application explained that the search was for "any automatic firearms or parts to automatic weapons, destructive devices to include but not limited to grenades, grenade launchers, rocket launchers, and any and all receipts pertaining to the purchase or manufacture of automatic weapons or explosive devices or launchers." *Id.* at 554 (internal quotation marks omitted). An affidavit accompanied the application, and a magistrate judge signed the warrant form. *See id.* The warrant in *Groh*, however, "failed to identify any of the items that [the agents] intended to seize." *Id.* Instead, in the section of the warrant "that called for a description of the 'person or property' to be seized, [the agents] typed a description of respondents' two-story blue house rather than the alleged stockpile of firearms." *Id.* The warrant did not incorporate by reference either the application (which, unlike the warrant, did contain a description of the property to be seized) or the affidavit.

Writing for a majority of the Supreme Court, Justice Stevens explained that the warrant was facially invalid because it "failed altogether" to describe with particularity the property to be seized. *Id.* at 557. Moreover, because the warrant did not incorporate the application by reference, the description of property in the

16

application did not "save the *warrant* from its facial invalidity." *Id.* (emphasis in original). Nor did the fact that the search of the ranch was "reasonable" to cure the facial defect in the warrant. *Id.* at 558 (internal quotation marks omitted). The Court thus held that the search was unconstitutional under the Fourth Amendment. *See id.* at 563.

As in *Groh*, in the instant case, although the application particularly described the contraband petitioner expected to find, the warrant failed to identify any of the items to be seized (other than a recreational vehicle – which is actually a "place to be searched" and not an "item to be seized"). Moreover, the warrant in the instant case did *not* incorporate by reference the itemized list contained in the application (i.e., Attachments D and E). Hence, just like the warrant in *Groh*, the warrant in this case was plainly invalid (or alternatively, the warrant did *not* authorize law enforcement officials to seize the numerous items that were seized when the search warrant was executed). As explained by the Supreme Court in *Groh*:

> The fact that the application adequately described the "things to be seized" does not save the warrant from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents. And for good reason: "The presence of a search warrant serves a high function," *McDonald v. United States*, 335 U.S. 451, 455 (1948), and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her

17

inspection.

*Groh*, 540 U.S. at 557 (some citations omitted).[6]

In *Groh*, the Supreme Court held that the petitioner was not entitled to qualified immunity, reasoning:

> "[A] warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid."  [*United States v.*] *Leon*, 468 U.S. [897,] 923 [(1984)].  This is such a case.

*Id.* at 565.  For this same reasoning, the *Leon* good faith exception does not apply in the instant case (i.e., the warrant in this case was so facially deficient because it failed to particularize the things to be seized that the executing officers could not reasonably presume it to be valid).

Accordingly, Appellant Brown has established that the facially invalid search

---

[6] In *Groh*, the Supreme Court said that the omission in the warrant in that case was not "a mere technical mistake or typographical error."  *Groh*, 540 U.S. at 558.  And as explained by Judge Steele  in *United States v. Crabtree*, 77 F. Supp. 3d 1192, 1197 (S.D. Ala. 2015):

> Whatever the outer boundaries of a technical mistake or typographical error under *Groh* may be, they do not encompass *a complete failure* to describe the premises intended to be searched.  This is obvious from *Groh* itself, which held that a failure to describe the items to be seized "at all" could not be characterized as a technical mistake or typographical error.  540 U.S. at 558.

(Emphasis added).  In the instant case, the warrant fails to describe the items to be seized "at all."

warrant in this case was plainly erroneous.  Reliance on the items improperly seized pursuant to this facially invalid warrant to obtain convictions in this case clearly affected Appellant Brown's substantial rights (i.e, his Fourth Amendment rights), and upholding Appellant Brown's convictions based on items obtained as a result of a facially invalid warrant would seriously affect the fairness, integrity, or public reputation of judicial proceedings.

> c.    The magistrate judge in the District of Columbia lacked jurisdiction to issue a search warrant for Appellant Brown's residence and property in the Middle District of Florida

The search warrant in this case was issued by a Magistrate Judge in the District of Columbia.  The search warrant was issued pursuant to Federal Rule of Criminal Procedure 41(b)(3), which states that " a magistrate judge – in an investigation of domestic terrorism or international terrorism – with authority in any district in which *activities related to the terrorism* may have occurred has authority to issue a warrant for a person or property within or outside that district." (emphasis added).  According to Rule 41(a)(2)(D), the phrase "domestic terrorism" in Rule 41(b)(3) is defined in 18 U.S.C. § 2331.  18 U.S.C. § 2331(5) states:

> [T]he term "domestic terrorism" means activities that –
> (A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;
> (B) appear to be intended –
> (i) to intimidate or coerce a civilian population;
> (ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
(C) occur primarily within the territorial jurisdiction of the United States[.]

The search warrant application in this case alleged possible violations of (1) 18 U.S.C. § 371, the general conspiracy statute; (2) 18 U.S.C. § 231, transport of firearms or explosives for use in civil disorder; (3) 18 U.S.C. § 844, transportation of explosives; and (4) 18 U.S.C. § 1752, unlawful entry on restricted grounds.

In the motion to suppress, Appellant Brown "dispute[d] that the facts alleged in the search warrant rise to the level of probable cause that [he] was involved in any offense that meets the definition of 'domestic terrorism.'" (Doc 186, at 6). The motion to suppress proceeded to address each paragraph of the search warrant affidavit and the motion to suppress explained that the allegations "fall far short of probable cause to support the" charges set forth in the application. (Doc 186, at 7-15).[7] The motion to suppress concludes with the following argument:

Notably missing from the application are any allegations that Mr. Brown committed violence against any individual, directed anyone to commit violence at the rally, that he went into the Capitol building, that he vandalized any property, or directed others to go into the Capitol building. There is no allegation in the affidavit that Mr. Brown conspired with anyone to incite any type of violence. There is no

_____

[7] Due to space limitations, undersigned counsel is unable to repeat each of the assertions set forth in the motion to suppress and therefore undersigned counsel incorporates by reference those assertions.

allegation that anyone saw Mr. Brown in possession of a firearm or explosive while at the Capitol. There is no allegation that anyone saw the R.V. anywhere near the Capitol.

In sum, there are no allegations in the affidavit that Mr. Brown's actions on and around January 6, 2021: "appear to be intended - (i) to intimidate or coerce a civilian population, (ii) to influence the policy of a government by intimidation or coercion, or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." *See* 18 U.S.C. § 2331(5).

It is submitted that the affiant was stretching to create probable cause to search Mr. Brown's property. Because there is no evidence or suggestion that Mr. Brown was violent, the affiant details violent acts of others but provides no nexus to Mr. Brown. The affiant details that members of the Oath Keepers were observed walking aggressively in a line towards the Capitol building but again, provides no nexus to Mr. Brown. The few speculative allegations that the affiant uses to attempt to invoke the Washington, D.C. magistrate judge's jurisdiction related to "domestic terrorism" are that (a) "Defendant 4" gave an unsworn statement to an unknown person via an unknown medium that he saw a cache of non-specific "weapons" in an R.V. that Mr. Brown was taking up to Washington, D.C. for the rally (b) Kelly Meggs informed "Defendant 4" that Mr. Brown was a "loose cannon" and said Mr. Brown had nonspecific "explosives" inside the R.V., (c) Mr. Brown went on a Signal text application and referenced a "Ground Force One" departure plan to attend the January 6, 2021, rally and mentioned, amongst other things, that he had gun ports left to fill, (d) the inaccurate assertion that Mr. Brown had a white board with a notation in color coding that he had "flash bangs" on hand some eight or more months after the riots broke out at the rally in Washington D.C., and (e) at an unknown time, Mr. Brown had unspecified weapons laying around his unorganized house. Not only are these allegations insufficiently corroborated, they are insufficiently detailed. For instance, the "cache of weapons" is not described, nor is there any indication of where the weapons were located in the R.V. or how "Defendant 4" was able to see them, or any indication of if the "weapons" were "illegal weapons" or firearms or some other form of weapon. Similarly, the "explosives" are not described, nor is their location within the R.V., or an explanation of how Mr. Meggs knew about the "explosives." Finally, there is no

description of the "weapons" the unnamed family member of "Witness 1" saw strewn about Mr. Brown's residence or whether that happened years or months prior to putting the house up for sale.

Paragraph 92 of the affidavit states that the affiant alleged there was probable cause to believe that there was evidence of the following crimes as to Mr. Brown: a general conspiracy pursuant to 18 U.S.C. § 371 and an unlawful misdemeanor trespass pursuant to 18 U.S.C. § 1752 (a)(1). The affiant also references § 1752(a)(2) which is a misdemeanor disorderly conduct offense. *Exhibit B: paragraph 92*. It is submitted that the affiant's conclusion is inaccurate – there was no probable cause that Mr. Brown was involved in any "conspiracy" to commit any illegal act whatsoever. The allegations in the affidavit show that Mr. Brown coordinated with others to attend a rally and nothing more. The Defense submits that the affiant did not establish probable cause that Mr. Brown's property in the Middle District of Florida contained evidence of criminal acts of domestic terrorism.

(Doc 186, at 15-17).

In its order denying the motion to suppress, the district court acknowledged Appellant Brown's argument that the affidavit failed to establish probable cause to believe that *he* was involved in any offense or "activities" that meet the definition of "domestic terrorism," but the district court concluded that no such allegations were necessary to support the issuance of the search warrant in this case:

Defendant's argument that the magistrate judge lacked jurisdiction to issue the search warrant erroneously focuses on the offenses identified in the affidavit rather than the investigation of which they are a part. *Defendant contends that the affidavit does not establish that he was involved in any offense that meets the definition of "domestic terrorism."* (*See* Doc. 186 at 6-16). The plain language of Rule 41(b)(3), however, provides venue to a magistrate judge "in an investigation of . . . terrorism," so long as any "activities related to the terrorism" occurred in the magistrate judge's district. The Rule is not

22

limited to any specific crime, nor does it require that a search warrant issued as part of a domestic terrorism investigation must itself allege acts that constitute domestic terrorism. Rule 41(b)(3), therefore, provides venue for a warrant authorizing a search of out-of-district property in a terrorism "investigation."

The facts contained in the instant affidavit established that the search warrant application was related to the Government's investigation of the events on January 6, 2021, when a mob stormed the United States Capitol while a Joint Session of Congress convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. (*See* Doc. 193, Ex. 1 at 5-15). The affidavit contained facts establishing that the events of January 6 "involve[d] acts dangerous to human life" that were "a violation of the criminal laws of the United States." 18 U.S.C. § 2331(5)(A). (*See* Doc. 193, Ex. 1 at 26-28). Additionally, the actions of January 6 "appear[ed] to be intended to influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(5)(B)(ii). (*See* Doc. 193, Ex. 1 at 22, 29, 31). Finally, the events described in the affidavit took place "within the territorial jurisdiction of the United States." (*See* id. at 21). Accordingly, the investigation of the January 6 attack constitutes a "domestic terrorism" investigation as defined by 18 U.S.C. § 2331(5). The magistrate judge, therefore, had authority to authorize the search warrant in the Middle District of Florida because it pertained to an "investigation of domestic terrorism" and "activities related to the terrorism may have occurred" in the District of Columbia.

(Doc 196, at 5-6) (emphasis added).

Contrary to the district court's reasoning, Appellant Brown submits that the Fourth Amendment requires a nexus between predicate criminal activity and the subject/scope of the warrant. In fact, as stated by Judge Faruqui (i.e., the magistrate judge who signed the search warrant in this case) in *In re Search of One Apple iPhone Smartphone*, 628 F. Supp. 3d. 155, 165 (D.D.C. 2022), "there must be a nexus

between the predicate crime and the scope of the warrant":

> "General warrants of course, are prohibited by the Fourth Amendment." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976). *Thus, there must be a nexus between the predicate crime and the scope of the warrant. See id.* at 481-482 (warrant only authorized a search for evidence relevant to the crime in question, not other crimes); *United States v. Carey*, 172 F.3d 1268, 1272-1273 (10th Cir. 1999). "[T]he scope of the search [or seizure is] thus circumscribed to evidence pertaining to [the predicate crime]." *Carey*, 172 F.3d at 1273.

(Emphasis added). *See also United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business.").

Hence, because the affidavit in this case failed to establish probable cause to believe that Appellant Brown was involved in any offense or "activities" that meet the definition of "domestic terrorism," the magistrate judge in the District of Columbia did not have jurisdiction under Rule 41(b)(3) to issue the search warrant for Appellant Brown's property in the Middle District of Florida.

d.    The affidavit was based on stale information

In the motion to suppress, Appellant Brown argued that the facts contained in the search warrant affidavit were "stale" because the predicate offenses that were the subject of the application/affidavit occurred nearly *nine months* prior to the date of the requested search and occurred in another jurisdiction – and therefore did not

24

establish probable cause that the items in question would be found at Appellant

Brown's property in Tampa:

> "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). The staleness doctrine "requires that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000). When determining staleness, courts should consider the length of time, "nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." *Id*. at 1265 (internal citations omitted). In considering the nature of the crime, the Eleventh Circuit has distinguished between criminal activity which is protracted and continuous and that which is isolated. *Id*. at 1265. "The circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Bervaldi*, 226 F.3d at 1265 (internal citation omitted).

Here, the affiant applied for the warrant to search for evidence of conspiracy, transport of firearms or explosives for use in civil disorder, transportation of explosives, and unlawful entry on restricted buildings or grounds. *Exhibit A*. The affiant alleges that Mr. Brown is suspected of transporting firearms or explosives for use in civil disorder on January 6, 2021, as well as that he trespassed and was disorderly on January 6, 2021. There are no allegations that Mr. Brown was continuously transporting firearms and/or explosives for use in other riots, or that he intended to trespass at a government building at a future rally. These offenses are discrete offenses that occurred nearly nine months prior in another jurisdiction.

Stale information can establish probable cause if "the government's affidavit updates, substantiates, or corroborates the stale material." *United States v. Jiminez*, 224 F.3d 1243, 1249 (11th Cir. 2000)(internal quotations omitted). Here, the Government was unable

to substantiate or update the stale material, other than the speculatory allegations and the inaccurate allegation that have been discussed above. Law enforcement attempted to substantiate or update the stale material with a variety of database investigation tools, including BaseJumper, Business Filings, CHS Check, Clearwater, DIVS, DMV, DWS, DaLAs, Guardian, NCIC, NetTalon, Photographic websites, Public search engines, Sentinel, Social Media, TIDE, Telephone applications, and Web Crawlers. *Exhibit H: Unclassified/LES Document generated July 20, 2021.* None of these investigatory tools revealed any evidence that Mr. Brown continued to possess evidence in the Middle District of Florida that he was involved in acts of domestic terrorism on January 6, 2021, in Washington, D.C.

"The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (internal citation omitted). As discussed above, the application for the warrant did not establish probable cause for any crime of domestic terrorism, and based on what amounts to only a misdemeanor trespass, there is no probable cause that evidence of this misdemeanor trespass would be found nine months later at his home nearly a thousand miles away.

Again, as analyzed above under issue one, it is submitted that the affiant was stretching to create probable cause to search Mr. Brown's property. None of the witnesses that the affidavit relied upon ("Defendant 4," "Kelly Meggs," or the "unidentified family member of Witness 1") had been tested in the past as to their credibility, trustworthiness, and history of providing accurate information. Even if the allegation from these individuals is true, the warrant application still fails to establish that there is a fair probability of finding evidence of a non-continuous offense in Mr. Brown's property in Florida nearly nine months later. The reference to a "flash bang" on a white board is not necessarily even a reference to an illegal object. The term "flash bang" encompasses many different types of devices. "Flash bangs" are light and noise distraction devices and those are readily available for purchase on the Internet through many sources. *Exhibit G: Printout of Website with Flash Bang Devices for Sale.*

The Eleventh Circuit has held that "[w]arrant applications based upon stale information fail to create probable cause that similar or other improper conduct is continuing." *United States v. Harris*, 20 F.3d 445,

26

450 (11th Cir. 1994) (internal citation omitted).  Here, the affidavit gave the reviewing magistrate no updated information as to why law enforcement believed that nearly nine months later "similar or other improper conduct is continuing" at his home in Florida.  *Id.*  This cannot satisfy the probable cause requirement to a warrant application.

(Doc 186, at 17-20).  In its order denying the motion to suppress, the district court rejected Appellant Brown's "staleness" argument.  (Doc 196, at 9-12).  The district court further found that even if the facts contained in the affidavit were stale, the "good faith exception to the exclusionary rule" would apply.  (Doc 196, at 13-15) (citing *United States v. Leon*, 468 U.S. 897 (1984)).[8]

Appellant Brown submits that the district court's "staleness" reasoning is erroneous.  In support of his argument, Appellant Brown relies upon *United States v. Grant*, 682 F.3d 827 (9th Cir. 2012).  In *Grant*, the police obtained a warrant to search Grant's home nine months after a homicide.  *See id.* at 828.  The police had "no evidence suggesting that Grant was involved" in the homicide; rather, the police suspected Grant's two sons.  *See id.* at 832-833.  The police had some evidence that

---

[8] The district court's *Leon* "good faith exception" reasoning was seemingly limited to the staleness argument and did not apply to the argument relating to the jurisdiction of the District of Columbia magistrate judge. (Doc 196, at 13-14) ("Had this Court determined that Rule 41(b)(3) did not authorize the magistrate judge to issue the search warrant because of staleness, Defendant's Motion would still be denied under the good faith exception to the exclusionary rule."). *But see United States v. Taylor*, 935 F.3d 1279 (11th Cir. 2019) (holding that the good faith exception to the exclusionary rule applied to evidence seized in reliance on a warrant that was void at issuance).

one of the sons visited his father approximately six months after the murder.  *See id.* at 833-834.  When the police searched Grant's home, they found nothing relating to the murder, but they found other firearms and therefore charged him with being a felon in possession of other firearms.  *See id.* at 828.  On appeal, the Ninth Circuit Court of Appeals concluded that application of the staleness doctrine precluded a finding of probable cause:

> In sum, the affidavit does not establish a "fair probability" that the gun or ammunition from the homicide would be in Grant's home nearly nine months after the murder.   Accordingly, we agree with the district court that the warrant was not supported by probable cause.

*Id.* at 835 (citation omitted).  The Ninth Circuit further concluded that the officers executing the warrant "could not have relied on it in good faith."  *See id.* at 841.

As in *Grant*, in the instant case, the affidavit does not establish a "fair probability" that evidence relating to the events surrounding January 6, 2021, would be at Appellant Brown's property in Tampa *nearly nine months after the fact*.  The allegations in this case involved the *transportation* of weapons to Washington, D.C. (rather than the storage of weapons in Tampa) and the allegations also concerned munitions (which are likely to be used) – meaning that it was not "probable" that these items would still be present in September of 2021.  And as in *Grant*, the good faith exception to the exclusionary rule does not apply because the law enforcement officials in this case knew or should have known that the information contained in the

28

affidavit was stale (i.e., it was "entirely unreasonable" for the officials to have relied on the warrant).  *See Leon*, 468 U.S. at 923.[9]

e.    The district court erred by denying Appellant Brown's request for a *Franks* hearing

In the motion to suppress, Appellant Brown requested a *Franks* hearing because the search warrant affidavit omitted the following material facts:

> As a substantial preliminary showing, the Defense asserts that the affiant did not include in the search warrant application the following material that was obtained after January 6 as part of the F.B.I. investigation into Mr. Brown (a) the contents of a July 28, 2021 podcast in which Mr. Brown participated wherein he stated in his opinion "The war is here ... but he is not calling for violence." *Exhibit I: Summary Transcript of Podcast at pg. 6, paragraph 2 (quotes taken from transcription created by law enforcement)*.  When asked about solutions to "win this war," Mr. Brown said the solution is "no different than happiness in life – figure out what you are good at and find a way to make money on it or use it to survive." He also advises to stop shopping at corporate conglomerates. *Exhibit I: pp. 7-8*.  In the podcast, Mr. Brown states that he "backs law enforcement officers that back up their oath to support the constitution, not arresting people for wearing a mask or beating up citizens." *Exhibit I: pg. 8*. and (b) Law enforcement conducted extensive investigation through a variety of database investigation tools.  *Exhibit H*.  None of these investigatory tools revealed any evidence that Mr. Brown continued to possess evidence in the Middle District of Florida that he was involved in acts of domestic

---

[9] Similarly, regarding the jurisdiction of the magistrate judge in the District of Columbia to issue the warrant, the law enforcement officials in this case knew or should have known there was an issue with jurisdiction for a search that would occur outside the magistrate judge's district (in the absence of allegations that Appellant Brown was involved in any offense or "activities" that meet the definition of "domestic terrorism").

terrorism on January 6, 2021, in Washington, D.C.

       As argued above, it is submitted that the affiant included a false statement in the affidavit (the coloring of the writing on the white board), that the affiant did not disclose that all efforts of other investigation had failed to produce any evidence that Mr. Brown was involved in acts of domestic terrorism, and that law enforcement did not reveal the contents of a podcast in which Mr. Brown publicly declared he was not calling for violence and supports law enforcement officers that follow their oath to support the constitution. It is submitted that all these issues contributed to the magistrate judge's finding of probable cause. The allegations in the affidavit against Mr. Brown specifically as to the offense of domestic terrorism are so weak that it cannot be stated that the magistrate judge would have issued the search warrant outside his jurisdiction nearly nine months after the riots but for these issues.

(Doc 186, at 23-25). The district court denied this subclaim and denied Appellant Brown's request for a *Franks* hearing. (Doc 196, at 15-18).

In *Franks*, the Supreme Court held that a defendant has a constitutional right "to challenge the truthfulness of factual statements made in an affidavit supporting the warrant," and it set out a procedural framework for allowing a defendant to do so. *Franks*, 438 U.S. at 155. First, as a threshold matter, the defendant must make a "substantial preliminary showing" that the affiant knowingly or recklessly misrepresented or omitted a material fact. *Id.* at 1551-56. If the defendant makes such a showing, "the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 156. Following a hearing, it is the defendant's burden to prove a violation by a preponderance of the evidence. *Id.*

30

In this case, Appellant Brown made a "substantial preliminary showing" that the affiant knowingly or recklessly omitted a material fact – in particular, that law enforcement officials had extensively investigated Appellant Brown through a variety of database investigation tools, *and none of these investigatory tools revealed any evidence that Appellant Brown continued to possess evidence in the Middle District of Florida that he was involved in acts of domestic terrorism on January 6, 2021 in Washington, D.C.* (Doc 189, Ex. H). "Omissions are made with reckless disregard where 'an officer withholds a fact in his ken that "[a]ny reasonable person would have known . . . was the kind of thing the judge would wish to know."'" *Andrews v. Scuilli*, 853 F.3d 690, 698 (2d Cir. 2017) (alterations in original) (citations omitted). Here, in deciding whether to approve a warrant to search Appellant Brown's property in another district, the issuing magistrate would obviously want to know about any other investigations that law enforcement officials had conducted relating to Appellant Brown. This information is clearly material, and "[r]ecklessness may be inferred from omission of facts which are 'clearly critical' to a finding of probable cause." *DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990). As argued above, Appellant Brown maintains that there was an insufficient nexus between the predicate crime(s) and the scope of the warrant – but assuming *arguendo* that there was a nexus, the omitted information would have undermined what minimal nexus existed

31

and vitiated probable cause.

At this stage, where Appellant Brown is merely requesting a hearing, he need not prove, and this Court need not decide whether, the omissions conclusively negate probable cause. He need only make a "substantial preliminary showing" that the omitted information was material to be entitled to a *Franks* hearing. Appellant Brown has made that requisite showing. The Court should therefore remand this case for a *Franks* hearing.

* * * * *

Accordingly, for all of the reasons set forth above, the district court erred by denying Appellant Brown's motion to suppress.

**2.      26 U.S.C. § 5861(d) – which punishes, as a felony, possession of an unregistered shotgun/rifle having a short barrel – is a facially unconstitutional restriction on a person's Second Amendment right to bear arms.**[10]

For Counts One and Two, Appellant Brown was charged with possession of an unregistered shotgun/rifle having a short barrel, in violation of 26 U.S.C. § 5861(d).  (Doc 250).[11]  Appellant Brown asserts that  26 U.S.C. § 5861(d) is facially unconstitutional under the Second Amendment to the Constitution, under the Supreme Court's clarification in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).[12]

a.      *Bruen* Clarified the Standard for Second Amendment Review

The Second Amendment to the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In *Bruen*, the Supreme Court clarified the

---

[10] In drafting this claim, undersigned counsel has relied upon the pleadings filed by the defendant in *United States v. Miller*, case number 3:23-CR-00041 (N.D. Tex.).

[11] Count 1 alleged that Appellant Brown possessed "a CBC Industries shotgun, 410 Gauge, model SB42Y, serial number C1247014, having a barrel or barrels of less than 18 inches in length."  (Doc 250, at 1).  Count 2 alleged that Appellant Brown possessed a "Palmetto Armory rifle, 5.56 caliber, model PA-15, serial number LW257921, having a barrel or barrels of less than 16 inches in length."  (Doc 250, at 2).

[12] During the trial, defense counsel requested the district court to dismiss Counts One and Two because 26 U.S.C. § 5861(d) violates the Second Amendment.  (Doc 337, at 809-811).

appropriate standard for analyzing Second Amendment claims.  The Supreme Court held that lower courts had been incorrect in reading precedent to require a means-end analysis in evaluating Second Amendment claims.  *See Bruen*, 142 S. Ct. at 2129. Instead, the Supreme Court explained that *District of Columbia v. Heller*, 554 U.S. 570 (2008), held, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms" for self-defense.[13]  *Id.* at 2127 (quoting *Heller*, 554 U.S. at 595).  Further, the Supreme Court emphasized that "*Heller* and *McDonald* [*v. Chicago*, 561 U.S. 742 (2010),] expressly rejected the application of any" means-end scrutiny because "[t]he very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is really worth insisting upon."  *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).[14]  In place of a means-end analysis, then, the Supreme Court stated the following standard for considering Second Amendment claims:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The

---

[13] Based on the plain text, the Second Amendment right is "necessary to the security of a free State."

[14] The Government is tasked with protecting the rights guaranteed by the Constitution (i.e.,  "secure the blessings of liberty") – the Government has no authority to assess the "worth" of these rights.

government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129-2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).[15]

Thus, in applying *Bruen*'s standard, courts must first address the threshold question of whether the Second Amendment's plain text protects the property and conduct that is being regulated. *See id.* at 2126, 2134. If it does, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. This requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. Because "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *id.* at 2136 (quoting *Heller*, 554 U.S. at 634-635) (emphasis in original), the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Id.* at 2132.[16] Hence, in assessing

---

[15] *Bruen* concerned firearm regulation, but the Second Amendment protection applies to all "Arms" – not just firearms. *See Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (holding that Hawaii statute banning butterfly knives violated the Second Amendment).

[16] *See* The Federalist No. 28.

"unprecedented societal concerns or dramatic technological changes" that could not have been specifically anticipated by the Founders, "the historical inquiry that courts must conduct will often involve . . . determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation." *Id.* at 2132.[17]  To that end, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry."  *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767).

In light of those definitions and limits to the Second Amendment's protection, the Supreme Court in *Heller* addressed the threshold issue and determined that the law at issue – a complete ban on the possession of handguns – did implicate conduct protected by the Second Amendment, which prompted the Court's analysis of whether the regulation was in line with the Nation's history and tradition.  See *Heller*, 554 U.S. at 628.  After conducting a historical analysis, the Supreme Court concluded the Second Amendment did not support the complete ban on handguns created by the regulation at issue, and, as such, the regulation was unconstitutional.  *See id.* at 636.

---

[17] Although the Founders could not anticipate the exact changes, the Founders realized that there would be changes – which is why the Second Amendment contains firm restrictive language (i.e., "shall not be infringed").

b.     The National Firearms Act

The relevant part of the National Firearms Act ("NFA") states: "[i]t shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record ["NFRTR"]."  26 U.S.C. § 5861(d).  The NFA further provides that "[a]ny person who violates or fails to comply . . . shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both."  26 U.S.C. § 5871. Finally, the NFA provides:

> The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; [and] (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length . . . .

26 U.S.C. § 5845(a).

To lawfully possess the firearms identified by the NFA, the statute requires individuals to register their firearms in the NFRTR.  *See* 26 U.S.C. § 5841(b).  To register, any "manufacturer, importer, [] maker" and transferor must file an application with the Secretary of the Treasury that includes: (1) the proper stamp *evidencing payment of the $200 tax*; (2) identification for the firearm to be registered;

and (3) identification of the applicant (if the firearm is being transferred, the application must identify both the transferor and the transferee), including fingerprints and a photograph. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822.[18] However, the NFA establishes that the Secretary will deny an application if the making, transfer, receipt, or possession "of the firearm would place the person making the firearm [or the transferee] in violation of the law." 26 U.S.C. §§ 5812, 5822.

c.    Analysis

Appellant Brown submits that his convictions for Counts One and Two must be reversed because the charges violate the Second Amendment by regulating conduct that falls within its protection. In this case, the Court must determine whether, under the standard outlined in *Bruen*, the Second Amendment protects Appellant Brown's right to possess a short-barreled shotgun and rifle (or any armament that would be reasonably necessary for the security of a free State or useful to a well regulated militia call-up or deployment[19]).

Undersigned counsel acknowledges that the Supreme Court has previously held

---

[18] Notably, these firearms are *not* illegal to posses – but the NFA restricts the right of possession by requiring a tax. Furthermore, there is no tax to possess a pistol. Appellant Brown asserts that the Founders did not envision a federal law requiring a citizen to pay a tax for "the right [] to keep and bear Arms."

[19] A militia is defined as "the whole body of able-bodied male citizens declared by law as being subject to call to military service." Merriam Webster Online (2023), https://www.merriam-webster.com/dictionary/militia

that short-barreled shotguns/rifles do not fall within the scope of the Second Amendment's protections. Almost 100 years ago, the Supreme Court stated:

> In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.

*United States v. Miller*, 307 U.S. 174, 178 (1939). *See also Heller*, 554 U.S. at 625 ("We therefore read *Miller* to say only that the Second Amendment does not protect . . . short-barreled shotguns."). However, when the Supreme Court made this statement in *Miller*, it was *not* considering how such a weapon *could be used for self-defense*. The Court later held in *Bruen* that when a statute limits an individual's ability to bear a weapon commonly used in self-defense, the Constitution presumptively protects an individual's right to bear that weapon.

In the wake of the *Bruen* decision, there have been numerous challenges to statutes limiting a person's right to possess a firearm, as well certain weapons, parts, and ammunition. Recently, the Fifth Circuit Court of Appeals considered the constitutionality of 18 U.S.C. § 922(g)(8), which criminalizes possession of a firearm by a person subject to a domestic violence protective order. Applying *Bruen*, the Fifth Circuit found § 922(g)(8) to be inconsistent with the Nation's historical tradition of firearm regulation and, therefore, unconstitutional. *See United States v. Rahimi*,

59 F.4th 163 (5th Cir. 2023).[20]  The *Rahimi* court concluded *Bruen* represents an intervening change in law which renders § 922(g)(8) unconstitutional, overturning pre-*Bruen* Fifth Circuit decisions to the contrary.  *See also United States v. Bullock*, 2023 WL 4232309 (W.D. La. Jun. 28, 2023) (holding that federal felon-in-possession statute is unconstitutional as applied to the defendant); *United States v. Harper*, 2023 WL 5672311 (M.D. Penn. Sept. 1, 2023) (same).

In the instant case, Appellant Brown was a citizen of the United States with no criminal history who was neither under indictment nor restraining order when he possessed the weapons at issue.  Because he is undisputedly a person protected by the Second Amendment's plain text, one must apply *Bruen*'s framework for Second Amendment analysis to his possession of the short-barreled shotgun and rifle.

*Bruen* articulated two analytical steps.  First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct[.]"  *Bruen*, 142 S. Ct. at 2129-2130.  If so, then the "Constitution presumptively protects that conduct," and the Government "must justify its regulations by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.  "Only then may a court conclude that the individual's conduct falls outside the

---

[20] The Supreme Court recently granted the Government's certiorari petition in order to review the Fifth Circuit's holding in *Rahimi*.

40

Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

To carry its burden, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131-2132 (internal quotation marks omitted). "[The courts] are not obliged to sift the historical materials for evidence to sustain [the statute, t]hat is [the Government's] burden." *Id.* at 2150.

Although in *Heller*, the Supreme Court explained that *Miller* stands for the proposition "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." 554 U.S. at 625, this holding is in doubt in light of the Supreme Court's subsequent decision in *Bruen*. While *Bruen* dictates "the Second Amendment protects the possession and use of weapons that are 'in common use at the time," *Bruen*, 142 S. Ct. at 2128, the Supreme Court also stated:

> After holding that the Second Amendment protected an individual right to armed self-defense, we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right. We noted that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." [*Heller*, 554 U.S.] at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Ibid*. For example, we found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Second Amendment protects the possession and use

of weapons that are "'in common use at the time.'"  *Id.* at 627 (first
citing 4 W. Blackstone, *Commentaries on the Laws of England* 148-149
(1769); then quoting [] *Miller*, 307 U.S. [at] 179 []).

The question in the instant case is whether a short-barreled shotgun/rifle was a

"dangerous and unusual weapon" at the time the Second Amendment was enacted.

Appellant Brown submits that the historical records show that *it was not*.

The blunderbuss, for example, was commonly used during the American

Revolution. *See, e.g.*, https://www.americanrevolutioninstitute.org/event/lunch-bite

-a-short-barelled-blunderbuss-from-the-period-of-the-american-revolution/   (last

visited October 5, 2023). A blunderbuss, a predecessor of the shotgun, is a "short,

muzzle-loading shoulder weapon" with a flared muzzle.    *Blunderbuss*,

BRITANNICA, https://www.britannica.com/technology/blunderbuss (last visited

October 5, 2023).  One version of the English blunderbuss, which "persisted in

England into the early 1700s," features a barrel length of *15 $\frac{1}{4}$ inches* but an overall

length of 31 inches.  George C. Neumann, *The History of Weapons of the American*

*Revolution* 124 (1967).  Another version, typically used by the navy during the same

time, had a barrel length of 19 $\frac{7}{8}$ inches and an overall length of 33 $\frac{7}{8}$ inches.  *See id.*

Others from the mid-1700's had barrel lengths ranging from *12 $\frac{1}{8}$* to 22 $\frac{7}{8}$ inches,

and overall lengths between 31 $\frac{1}{8}$ and 39 inches.  *See id.* at 124-128.  Thus, many of

these firearms would qualify as short-barrel firearms at the time of the ratification of

the Second Amendment.  *See Bruen*, 142 S. Ct. at 2138-2139 ("Respondents' substantial reliance on English history and custom before the founding makes some sense given our statement in *Heller* that the Second Amendment codified a right inherited from our English ancestors.") (internal quotations omitted).  It follows that the Government *cannot* demonstrate that a restriction on the possession of short-barreled shotguns/rifles is consistent with the Nation's historical tradition of firearm regulation[21].  There is no evidence of *any regulation* of short-barreled shotguns or rifles before the enactment of the NFA in 1934 (i.e., no regulation in the 143 years between the adoption/ratification of the Second Amendment and the enactment of the NFA).

Unlike bombs, artillery, and other such weapons of war, a short-barreled shotgun/rifle should not be considered a "dangerous and unusual" weapon. According to the ATF's[22] 2021 Firearms Commerce Report[23] at 16, as of May 2021, there were approximately 532,000 registered short-barreled rifles in the United States and approximately 162,000 short-barreled shotguns.  Like any hand-held firearm, a

---

[21] It is also not consistent with current military and law enforcement use.

[22] Bureau of Alcohol, Tobacco, Firearms and Explosives.

[23] https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last visited October 5, 2023).

short-barreled shotgun/rifle may be used for self-defense. *See Heller*, 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right"). Indeed, it is difficult to understand a rational basis for restricting the possession of a short-barreled shotgun/rifle more than a handgun – which is obviously much smaller and easier to conceal. The vast majority of crimes do not involve firearms, but those that do are committed with *handguns* as opposed to rifles of any kind. *See* https://www.npr.org/2023/02/10/1153977949/major-takeaways-from-the-atf-gun-violencereport (last visited October 5, 2023).

As explained above, the National Firearms Act does *not* prohibit short-barreled rifles, but rather requires that they be taxed and registered with the federal government. The Supreme Court in *Bruen* held nothing in its analysis should be interpreted to suggest the unconstitutionality of the 43 states' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Bruen*, 142 S. Ct. 2111, 2138, n.9. However, the Supreme Court also stated, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id*. The process for getting a preexisting short-barreled rifle registered with the ATF currently takes approximately one year. *See*

44

https://www.atf.gov/resource-center/current-processing-times (last visited on October 23, 2023). This requirement, therefore, is a valid subject of the Second Amendment challenge.

* * * * *

Accordingly, for the reasons set forth above, Appellant Brown requests the Court to find that 26 U.S.C. § 5861(d) violates the Second Amendment. Under a historical-traditional framework, requiring a law-abiding citizen to pay a tax and to register a short-barreled shotgun/firearm is unconstitutional because it is not supported by the text, history, or tradition of the Second Amendment. Thus, § 5861(d) cannot survive the demands of *Bruen*. Appellant Brown's convictions for Counts One and Two should be reversed this case should be remanded to the district court with directions that the district court dismiss these two counts.

45

**3.      The Government committed misconduct by commenting on Appellant Brown's silence in a recorded conversation**.

During the trial, the Government introduced the audio recording of a call between Appellant Brown and Tylene Aldridge (Appellant Brown's girlfriend) – a call that was made from the jail on October 1, 2021 (the day after Appellant Brown was arrested).  (Doc 337, at 996-999) (Government's Exhibit 105B).[24]  During the Government's closing argument, the Government again played the call for the jury:

RECORDED VOICE:  Thank you for using Global Tel Link.

MR. BROWN:  Hello?

MS. ALDRIDGE:  Hello.  Hey, can you hear me?

MR. BROWN:  Yeah, I can hear you.

MS. ALDRIDGE:  Are you okay?

MR. BROWN:  Yeah, I'm fine.

MS. ALDRIDGE:  Oh, my gosh.  Okay.  Do I need to get an attorney?

MR. BROWN:  Well, hold on just – is everything okay?

MS. ALDRIDGE:  Yeah.  I haven't slept all night.  They were here for five and a half hours.

MR. BROWN:  Really?

---

[24] At the time of the jail call, Appellant Brown had been informed that the jail call was subject to monitoring by law enforcement officials.

MS. ALDRIDGE:  Yeah, they took eight guns, two uppers, grenades, unplugged our cameras.

MR. BROWN:  They unplugged them?

MS. ALDRIDGE:  Yeah, when I – the camera was unplugged.

MR. BROWN:  Why did they unplug them?

MS. ALDRIDGE:  (Inaudible.)

(Doc 340, at 1041-1042).  Immediately after playing the jail call, the Government

made the following argument to the jury:

MR. GOEDMAN [a prosecutor]:  Eight guns, two uppers and grenades, *then silence*.  And we know the defendant was listening because a moment later he responds with real surprise that the security cameras had been unplugged.

(Doc 340, at 1042) (emphasis added).  Later during the closing argument, the

Government argued that Appellant Brown's silence during the jail call amounted to

a "confession" to possessing grenades (Counts Three-Five):

And the defendant, you heard on the jail call – he told you in his testimony that he'd never seen these grenades before.  That's not the reaction of someone who is shocked to hear that grenades were found. *That silence is a confession*.

(Doc 340, at 1085-1086) (emphasis added).[25]  As explained below, Appellant Brown

---

[25] During its deliberations, the jurors asked to have the jail call replayed to them.  (Doc 340, at 1105-1106).  Notably, apparently due to technical difficulties, the call was replayed for the jury two times.  (Doc 340, at 1111-1118).  (Doc 340, at 1116) ([Defense counsel:] "I admit it was not as clear as the Government's playing,

47

asserts that the prosecutor committed misconduct by commenting on his silence during the jail call.

The Fifth Amendment to the Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. Zealously safeguarded as "an important constitutional liberty," *Hoffman v. United States*, 341 U.S. 479, 490 (1951), that was "hardearned by our forefathers," *Quinn v. United States*, 349 U.S. 155, 161 (1955), the privilege protects "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). In view of the significance of the right, its protections are broadly construed. *See Maness v. Meyers*, 419 U.S. 449, 461 (1975).

In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court held that the prosecution's use of post-arrest silence violates the Due Process Clause of the Fourteenth Amendment to the Constitution. "Post-arrest silence also may not be used against a defendant at trial in order to imply guilt from that silence." *Stone v. United States*, 258 Fed. Appx. 784, 787 (6th Cir. 2007).

In *Scott v. Diaz*, 2016 WL 8969577 at *23-24 (C.D. Cal. Dec. 16, 2016), the

---

but I object to it being played again without prompting. If the jurors want to write and say 'We can't hear, we'd like to hear it again,' bring them back, but I do not want to bring them back without their request.").

magistrate judge cited/quoted a California appellate decision for the following

principle:

> [T]he *Doyle* rule may, under certain circumstances, apply to a defendant's silence in the presence of private parties rather than police interrogators. (*People v. Hollinquest* (2010) 190 Cal. App. 4th 1534, 1556-1558 (*Hollinquest*).)
>
> In the context of private parties, *Doyle* applies when the evidence demonstrates that the defendant's silence in front of a private party results primarily from the conscious exercise of his constitutional rights. (*People v. Eshelman* (1990) 225 Cal. App. 3d 1513, 1520 (*Eshelman*).) Accordingly, in *People v. Medina* (1990) 51 Cal. 3d 870, 890-891, an incarcerated defendant's silence in the face of his sister's questions during a jail visit could properly be introduced as evidence against him *because the record did not suggest that he believed his conversation was being monitored* or that his silence was intended to be the invocation of a constitutional right. In *Eshelman*, in contrast, the defendant expressly told his girlfriend that he could not answer her questions on the advice of his counsel. This was sufficient to demonstrate that his silence was an assertion of his constitutional rights to counsel and to silence; *Doyle* therefore precluded the use of his silence as evidence of guilt. (*Eshelman*, *supra*, at pp. 1520-1521.)
>
> The facts in *Hollinquest*, *supra*, 190 Cal. App. 4th at page 1557, were more ambiguous than those in *Eshelman* because the defendant did not expressly or implicitly assert the right to silence and counsel; *his silence took place during telephone calls that featured intermittent recorded warnings that the telephone calls were being recorded. Under such circumstances, the court concluded that the context of the telephone calls was indicative of an exercise of the constitutional rights to silence* and counsel, and therefore "assum[ed]" that the defendant's silence was an assertion of the right to remain silent. (*Ibid.*) Accordingly, *Doyle* error occurred when the prosecutor urged the jury to draw an inference of guilt from the defendant's silence during the phone calls. (*Id.* at pp. 1557-1558.)

(Emphasis added). As in *Hollinquest*, in the instant case, Appellant Brown's

"silence" took place during a jail call for which Appellant Brown had been informed was subject to monitoring by law enforcement officials. Under such circumstances, the context of the jail call was indicative of an exercise of the constitutional right to silence. The Government's argument to the jury that Appellant Brown's "silence is a confession" therefore violated *Doyle* and Appellant Brown's Fifth and Fourteenth Amendment rights.

Accordingly, Appellant Brown has established that the prosecutor's reliance on his post-arrest silence was plainly erroneous. The prosecutor's actions clearly affected Appellant Brown's substantial rights (i.e, his Fifth and Fourteenth Amendment rights) – as the Government specifically argued to the jury that Appellant Brown's "silence is a confession." Thus, upholding Appellant Brown's convictions (or at least his convictions for Counts Three-Five) in the face of this constitutional violation would seriously affect the fairness, integrity, or public reputation of judicial proceedings.

50

### K.  CONCLUSION

For Issue 1, the Court should reverse the order denying Appellant Brown's motion to suppress and vacate Appellant Brown's convictions.  For Issue 2, the Court should vacate Appellant Brown's convictions for Counts One and Two.  For Issue 3, the Court should vacate all convictions (or at least the convictions for Counts Three-Five) and remand for a new trial.

## L.  CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) that this brief complies with the type-volume limitation.  The number of words in this brief is 12,992.

## M.  CERTIFICATE OF SERVICE

I HEREBY CERTIFY a true and correct copy of the foregoing instrument has

been furnished to:

> Office of the United States Attorney
> Deputy Chief, Appellate Division
> 400 North Tampa Street, Suite 3200
> Tampa, Florida 33602

by CM/ECF electronic and U.S. mail delivery this 23rd day of October, 2023.

Respectfully submitted,

/s/ Michael Ufferman
MICHAEL UFFERMAN
Michael Ufferman Law Firm, P.A.
2022-1 Raymond Diehl Road
Tallahassee, Florida  32308
(850) 386-2345
FL Bar No. 114227
Email: ufferman@uffermanlaw.com

Counsel for Appellant **BROWN**

53