No. 23-11146-HH

In the
# United States Court of Appeals
# for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JEREMY BROWN,

*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 8:21-CR-348-SCB-SPF-1

## BRIEF OF THE UNITED STATES

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

HOLLY L. GERSHOW
Assistant United States Attorney
Deputy Chief, Appellate Division
Florida Bar No. 98960
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

January 16, 2024

*United States v. Jeremy Brown*
No. 23-11146-HH

## Certificate of Interested Persons and Corporate Disclosure Statement

In addition to the persons identified in the Certificate of Interested Persons and Corporate Disclosure Statement in Jeremy Brown's principal brief, the following person has an interest in the outcome of this case:

Hoppmann, Karin, former Acting United States Attorney.

No publicly traded company or corporation has an interest in the outcome of this appeal.

C-1 of 1

## Statement Regarding Oral Argument

The United States does not request oral argument.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement......... C-1

Statement Regarding Oral Argument ................................................................. i

Table of Contents ............................................................................................... ii

Table of Citations .............................................................................................. v

Statement of Jurisdiction ................................................................................. xi

Statement of the Issues .................................................................................... 1

Statement of the Case ...................................................................................... 1

    *Course of Proceedings* ................................................................................ 2

    *Statement of the Facts* ............................................................................... 3

    I.    A magistrate judge in the District of Columbia signs a search warrant to search Brown's property for evidence related to domestic terrorism ......................................................................... 3

    II.   Searching officers recover from Brown's house and RV a short-barreled shotgun, a short-barreled rifle, and two hand grenades, none of which were registered ........................................ 9

    III.  The district court denies Brown's motion to suppress and for a *Franks* hearing ............................................................................... 10

    IV.  Brown testifies at trial that he never saw the grenades and suggests that they were planted, and the prosecutor refutes those assertions by pointing to Brown's jailhouse call ................... 15

    *Standard of Review* ................................................................................. 16

ii

Summary of the Argument .......................................................... 17

Argument and Citations of Authority ......................................... 21

I.  The district court did not err in denying Brown's suppression
    motion ............................................................................. 21

    A.  The magistrate judge in the District of Columbia had
        jurisdiction to issue the search warrant ...................... 23

    B.  The search warrant was not based on stale information ............ 26

    C.  The good-faith exception to the exclusionary rule applies .......... 28

II. The district court did not abuse its discretion in denying Brown's
    motion for a *Franks* hearing.............................................. 31

III. Brown waived his claim that the search warrant was facially
    invalid due to a typographical error that referred to Attachment
    B instead of Attachment E by affirmatively abandoning that
    argument below, and, even if he did not, he has not shown that
    the district court plainly erred by not suppressing the evidence on
    that ground...................................................................... 33

IV. The NFA's registration requirement for short-barreled shotguns
    and rifles does not violate the Second Amendment ........................... 39

    A.  Controlling precedent forecloses Brown's challenge to his
        § 5861(d) convictions for possession of an unregistered
        short-barreled shotgun and rifle................................. 40

    B.  Even if this Court were to look at this issue anew,
        § 5861(d)'s prohibition on unregistered short-barreled
        shotguns and rifles passes constitutional muster under the
        *Bruen* framework........................................................ 44

(1)     *The Second Amendment does not cover the possession of unregistered short- barreled shotguns and rifles* ........................ 44

(2)     *The NFA's registration requirement for short-barreled shotguns and rifles is consistent with the Nation's historical tradition of firearm regulation* .................................................. 48

(3)     *Brown's argument—raised for the first time on appeal— based on the registration-processing time does not withstand plain-error review* .................................................................. 50

V.     Brown is not entitled to relief on his claim that the district court plainly erred by allowing the prosecutor to comment on his "silence" on a jail call with his girlfriend .......................................... 52

Conclusion ..................................................................................... 57

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

iv

# Table of Citations

## Cases

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
47 F.4th 1278 (11th Cir. 2022)..............................................................22, 32

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
26 F.4th 1214 (11th Cir.), *cert. denied*, 143 S. Ct. 486 (2022)......................43

*\*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................... 39, 41–45, 47–48

*Doyle v. Ohio*,
426 U.S. 610, (1976) ...............................................................................53–54

*Franks v. Delaware*,
438 U.S. 154 (1978) ........................................ 1, 3, 10, 14, 16, 18, 21, 31–33

*Greer v. United States*,
141 S. Ct. 2090 (2021)................................................................................. 55

*Groh v. Ramirez*,
540 U.S. 551 (2004) ...............................................................................36–37

*Hawkins v. United States*,
2016 WL 9528784 (11th Cir. Dec. 9, 2016)..........................................37–38

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023) ...................................................................... 45

*\*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022).......................................................................... 40–49, 52

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) ...................................................................... 49

*Turner v. Burnside*,
541 F.3d 1077 (11th Cir. 2008)...............................................................46–47

*United States v. Abdalla*,
972 F.3d 838 (6th Cir. 2020) ...................................................................... 38

*United States v. Bervaldi*,
   226 F.3d 1256 (11th Cir. 2000) ................................................................ 26

*United States v. Bolatete*,
   977 F.3d 1022 (11th Cir. 2020) .................................................... 17, 50–51

*United States v. Cabezas-Montano*,
   949 F.3d 567 (11th Cir. 2020) ................................................................ 54

*United States v. Campbell*,
   26 F.4th 860 (11th Cir.) (en banc), *cert. denied*, 143 S. Ct. 95 (2022) ........... 34

*United States v. Campbell*,
   223 F.3d 1286 (11th Cir. 2000) .................................................... 17, 55–56

*United States v. Cox*,
   906 F.3d 1170 (10th Cir. 2018) ................................................................ 46

*United States v. Cruz-Rodriguez*,
   570 F.3d 1179 (10th Cir. 2009) ................................................................ 35

*United States v. Curbelo*,
   726 F.3d 1260 (11th Cir. 2013) ................................................................ 35

*United States v. Fey*,
   No. 22-11373, 2023 WL 8946234 (11th Cir. Dec. 28, 2023) ...................... 53

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ..........................................................32–33

*United States v. Gibson*,
   708 F.3d 1256 (11th Cir. 2013) ................................................................ 25

*United States v. Goldstein*,
   989 F.3d 1178 (11th Cir. 2021) ................................................................ 16

*United States v. Harris*,
   20 F.3d 445 (11th Cir. 1994) ................................................................... 27

*United States v. Horsfall*,
   552 F.3d 1275 (11th Cir. 2008) ................................................................ 35

*United States v. Johnson*,
  921 F.3d 991 (11th Cir. 2019) .................................................. 42

*United States v. Johnson*,
  981 F.3d 1171 (11th Cir. 2020) ................................................ 43

*United States v. Laines*,
  69 F.4th 1221 (11th Cir. 2023) ................................................ 36

*United States v. Lewis*,
  492 F.3d 1219 (11th Cir. 2007) ...........................................17, 35

*United States v. McCall*,
  84 F.4th 1317 (11th Cir. 2023) ...................................... 22, 29–31

*United States v. Meadows*,
  523 F.2d 365 (5th Cir. 1975) .................................................. 51

*United States v. Miller*,
  24 F.3d 1357 (11th Cir. 1994) .............................................21–22

*United States v. Miller*,
  307 U.S. 174 (1939) ...............................................40–44, 47–48

*United States v. Miller*,
  No. 20-10194, 2023 WL 155212 (11th Cir. Jan. 11, 2023) ........................ 35

*United States v. Miller*,
  No. 3:23-cr-41, 2023 WL 6300581 (N.D. Tex. Sept. 27, 2023) ............39, 46

*United States v. Morales*,
  987 F.3d 966 (11th Cir. 2021) ...................................... 16, 28–29

*United States v. O'Keefe*,
  461 F.3d 1338 (11th Cir. 2006) ................................................ 54

*United States v. Phillips*,
  834 F.3d 1176 (11th Cir. 2016) ................................................ 16

*United States v. Qazah*,
  810 F.3d 879 (4th Cir. 2015) .................................................. 36

*United States v. Rivera*,
  824 F. App'x 930 (11th Cir. 2020) ............................................................ 35

*United States v. Russa*,
  807 F. App'x 990 (11th Cir. 2020) ........................................................ 35–36

*United States v. Sperrazza*,
  804 F.3d 1113 (11th Cir. 2015) ................................................................. 35

*United States v. Stubbs*,
  944 F.2d 828 (11th Cir. 1991) .................................................................. 54

*\*United States v. Taylor*,
  935 F.3d 1279 (11th Cir. 2019) ............................................................ 28–30

*United States v. Thompson/Ctr. Arms Co.*,
  504 U.S. 505 (1992) ................................................................................. 45

*United States v. Touset*,
  890 F.3d 1227 (11th Cir. 2018) ................................................................. 27

*United States v. Waker*,
  534 F.3d 168 (2d Cir. 2008) ..................................................................... 38

*United States v. Weinstein*,
  762 F.2d 1522 (11th Cir. 1995) ................................................................. 34

*United States v. Wilchcombe*,
  838 F.3d 1179 (11th Cir. 2016) ................................................................. 56

*\*United States v. Wilson*,
  979 F.3d 889 (11th Cir. 2020) ................................................. 17, 41, 43–44

*United States v. Wuagneux*,
  683 F.2d 1343 (11th Cir. 1982) ................................................................. 33

*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978) ................................................................................. 25

**Statutes**

18 U.S.C. § 111(a) ........................................................................................ 24

18 U.S.C. § 231(a)(2) ................................................................ 4, 24

18 U.S.C. § 371 ........................................................................ 4, 24

18 U.S.C. § 793(e) ......................................................................... 3

18 U.S.C. § 842(j) .......................................................................... 2

18 U.S.C. § 844(a)(2) ................................................................ 4, 24

18 U.S.C. § 844(b) .......................................................................... 2

18 U.S.C. § 1752 ........................................................................... 24

18 U.S.C. § 1752(a) ........................................................................ 4

18 U.S.C. § 1752(a)(1) ................................................................. 24

18 U.S.C. § 1752(a)(2) ................................................................. 24

18 U.S.C. § 2331 ........................................................................... 23

18 U.S.C. § 2331(5) ...................................................................... 23

18 U.S.C. § 2331(5)(A) ................................................................ 11

18 U.S.C. § 2331(5)(B)(ii) ........................................................... 11

18 U.S.C. § 3231 ............................................................................ xi

26 U.S.C. § 5104(c)(2)(F) ............................................................ 24

26 U.S.C. § 5811 ........................................................................... 39

26 U.S.C. § 5812 ........................................................................... 39

26 U.S.C. § 5821 ........................................................................... 39

26 U.S.C. § 5822 ........................................................................... 39

26 U.S.C. § 5861(d) ................................. 1–2, 17, 20, 39–40, 48, 52

28 U.S.C. § 1291 ............................................................................ xi

## Rules

Fed. R. App. P. 4(b) ................................................................. xi

Fed. R. Crim. P. 12 ................................................................. 35

Fed. R. Crim. P. 12(b)(3) ...................................................... 35

Fed. R. Crim. P. 12(e) ........................................................... 35

Fed. R. Crim. P. 41(a)(2)(D) ................................................. 23

Fed. R. Crim. P. 41(b)(3) ...................................... 11, 23, 25, 26

Fed. R. Crim. P. 52(b) ........................................................... 36

## Other Authorities

27 C.F.R. § 555.201 *et seq.* .................................................. 2, 3

Gun Law History in the United States and Second Amendment Rights,
  80 Law & Contemp. Probs. 55 (2017) .............................. 49

Webster's American Dictionary of the English Language ........... 47

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Middle District of Florida in a criminal case. That court had jurisdiction. *See* 18 U.S.C. § 3231. The court entered judgment against Jeremy Brown on April 7, 2023, Doc. 357, and Brown timely filed a notice of appeal two days later, Doc. 360. *See* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal. *See* 28 U.S.C. § 1291.

**Statement of the Issues**

I.      Did the district court err in denying Brown's motion to suppress? (Brown's Issue I)

II.     Did the district court abuse its discretion in denying Brown's motion for a *Franks* hearing? (Brown's Issue I)

III.    Did Brown waive his claim that the search warrant was facially invalid because of a typographical error referring to Attachment B instead of Attachment E by affirmatively abandoning that argument below, and, if not, has he shown that the district court plainly erred by not suppressing the evidence on that ground? (Brown's Issue I)

IV.    Does the National Firearms Act's registration requirement for short-barreled shotguns and rifles, 26 U.S.C. § 5861(d), violate the Second Amendment? (Brown's Issue II)

V.      Is Brown entitled to relief on his claim that the district court plainly erred by allowing the prosecutor to comment on his "silence" on a jail call with his girlfriend? (Brown's Issue III)

**Statement of the Case**

On January 6, 2021, a mob stormed the U.S. Capitol to disrupt the certification of the presidential election results. Members of the Oath Keepers were among those who forcibly entered the Capitol. Jeremy Brown traveled to

Washington, D.C., with members of the Oath Keepers and a cache of weapons and trespassed at the Capitol on January 6 wearing military gear.

While investigating the domestic terrorism that occurred that day, federal agents obtained a search warrant from a magistrate judge in the District of Columbia authorizing the search of Brown's home, RV, and trailer, located in the Middle District of Florida. During the ensuing search, agents found a short-barreled shotgun, a short-barreled rifle, a vest holding two hand grenades, and classified documents. The next day, when Brown's girlfriend told him that the agents had found and seized grenades, he responded not with surprise but with silence.

A jury convicted Brown of five counts related to his possession of the firearms and explosives and one count of willful retention of a national-defense document. This is his appeal of those convictions.

### Course of Proceedings

A grand jury returned an indictment charging Brown with two counts of possession of an unregistered firearm with an unlawfully short barrel, in violation of 26 U.S.C. §§ 5861(d) and 5871 (counts one and two); two counts of possessing unregistered destructive devices, in violation of 26 U.S.C. §§ 5861(d) and 5871 (counts three and four); and one count of improperly storing explosive material, in violation of 18 U.S.C. § 842(j), 844(b), and 27

2

C.F.R. § 555.201 *et seq.* (count five). Doc. 21.[1] The grand jury then superseded the indictment to add four counts of unauthorized possession and retention of documents relating to the national defense, in violation of 18 U.S.C. § 793(e) (counts six through nine). Doc. 159. And it again superseded the indictment to add another unauthorized-possession-and-retention count (count ten). Doc. 250.

Brown filed a motion to suppress, Doc. 121, but later moved to strike it to file an amended motion, Doc. 126. He then filed an amended motion to suppress and for a *Franks* hearing. Doc. 186. The United States opposed that motion, Doc. 193, and the court denied it, Doc. 196.

During trial, Brown argued that the court should dismiss counts one and two because they violated the Second Amendment. Doc. 337 at 36. The court rejected that claim. *Id.* at 37. The jury then found Brown guilty on counts one through five and count ten but not guilty on the remaining counts. Doc. 305.

## Statement of the Facts

### I.    A magistrate judge in the District of Columbia signs a search warrant to search Brown's property for evidence related to domestic terrorism.

On September 29, 2021, a magistrate judge in the District of Columbia

---

[1]Except as stated, we cite all record documents based on the page number that appears in the header generated by the district court's electronic filing system. We cite Brown's brief using its own page numbers.

authorized a search warrant for Brown's residence, recreational vehicle (RV), trailer, and cellphone, located in the Middle District of Florida, to search for evidence of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 231(a)(2) (transport of firearms or explosives for use in civil disorder), 18 U.S.C. § 844(a)(2) (transportation of explosives), and 18 U.S.C. § 1752(a) (unlawful entry on restricted buildings or grounds). Doc. 193, Ex. 1 (search warrant).

The search-warrant affidavit explained that, on January 6, 2021, "individuals had broken through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP [U.S. Capitol Police] and supporting law enforcement officers there to protect the U.S. Capitol," and that "[p]ipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters." Doc. 193, Ex. 1 (Affidavit ¶ 21).[2] Rioters "broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol," and, "[o]nce inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers," injuring and hospitalizing many officers. *Id.* ¶ 28. The "subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers," and "took police

---

[2]The search-warrant affidavit is included in exhibit one to Doc. 193. But because the ECF page numbers are illegible on that exhibit, we cite the affidavit directly by paragraph number.

equipment from overrun police including shields and police batons and used them against law enforcement officers trying to protect the U.S. Capitol." *Id.* ¶ 29.

The affidavit detailed that these acts of violence occurred while a Joint Session of Congress had "convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election." Affidavit ¶ 9. Based on the riots, trespassing, and acts of violence, "all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m." *Id.* ¶ 39.

The affidavit explained that members of the Oath Keepers "were among individuals and groups who forcibly entered the Capitol on January 6, 2021." Affidavit ¶ 49. Video footage showed a "stack" of Oath Keepers "wearing helmets, reinforced vests, and clothing with Oath Keepers logos and insignia … forcing their way to the front of the crowd gathered around a set of doors to the Capitol." *Id.* ¶ 52. "More than a dozen Oath Keepers … have been charged for their involvement in the January 6 riots." *Id.* ¶ 54.

The affidavit alleged that Brown was present and trespassed at the Capitol on January 6, while wearing "full military gear, including a helmet, radio, a tactical vest, and prominently displayed large surgical trauma shears,"

and included this photograph of Brown from that day:



Affidavit ¶ 56. Brown did not comply voluntarily with officers' directives to move back and only moved "when pushed with police baton sticks." *Id.* ¶ 57. The affidavit contained a photograph from body-camera footage showing an officer pushing Brown back out of the restricted area. *Id*:



"Defendant 4," a member of the Oath Keepers who had pleaded guilty to having conspired to obstruct an official proceeding, reported that Brown had traveled to Washington, D.C., with other Oath Keepers in an RV that was "loaded with a cache of weapons, ammunition, and gas." Affidavit ¶¶ 57, 60. Kelly Meggs, a leader of the Oath Keepers, told Defendant 4 that Brown had explosives inside the RV. *Id.* ¶ 60.

The affiant corroborated Defendant 4's statements by determining that Defendant 4 had used a ride-share application to travel to Brown's residence and by reviewing messages Brown had sent. Affidavit ¶¶ 59, 61. In these messages, Brown shared his plans to drive himself and other Oath Keepers from his house to the Capitol in his RV. *Id.* ¶ 61. Brown's messages stated that there were "[p]lenty of Gun Ports left to fill" and that there would be "Pre Combat Inspections" before the RV departed. *Id.* Brown further wrote that, once in Washington, D.C., they would conduct "Close Target Reconnaissance." *Id.* The affidavit also pointed to Brown's later public statements, including that he was "present with Oath Keepers on January 6,"and that, before the riots, he had "deposited his guns with other Oath Keepers in Virginia and retrieved them after the riots." *Id.* ¶ 64.

The affidavit also explained that, during the investigation, Brown had listed his home for sale on the real-estate website Zillow, and the Zillow

advertisement included a photograph that showed a whiteboard listing many firearms and explosives, including "flash bangs." Affidavit ¶¶ 67–68. According to the legend at the bottom of the whiteboard, items written in black ink were "on hand." *Id.* ¶ 68. In the photograph, the list of firearms and explosives was written in what appeared to be black ink, suggesting that they were in Brown's possession when the photograph was taken:



*Id.* The affidavit also cited "Witness 1"'s statement that, before Brown had put his residence up for sale on Zillow, there had been "multiple boxes and weapons scattered throughout the house." *Id.* ¶ 71.

The affidavit noted that Brown was still residing at the residence and that officers had observed the RV and trailer parked in front as recently as September 21, 2021. Affidavit ¶¶ 69–70. Agents also observed Brown leaving the residence within a week of when the affidavit was submitted. *Id.* ¶ 74. The affidavit explained that, because Brown was planning to move and had

8

recently bought the trailer, it was "probable that many of [his] possessions, including electronics, guns, ammunition, and explosives, which constitute potential evidence in the investigation, have been moved to the RV or the Trailer." *Id.* ¶ 72.

## II. Searching officers recover from Brown's house and RV a short-barreled shotgun, a short-barreled rifle, and two hand grenades, none of which were registered.

On September 30, FBI agents arrested Brown outside of his home and then executed the search warrant. Doc. 333 at 202–203; Doc. 334 at 39. Agents found a short-barreled shotgun, a briefcase containing military documents, and two hand grenades in the RV. Doc. 333 at 205–210, 213; Doc. 304 at 56–58; *see also* Docs. 307-9–307-25; 307-47–307-57. The hand grenades were found in the pockets of a "chest rig" in the RV's bedroom. Doc. 333 at 209–210. (A "chest rig," as the name suggests, "is worn over a person's chest" and "has many pouches and pockets that can store magazines for weapons and other battle items." Doc. 333 at 209; Doc. 335 at 49–51; *see also* Doc. 307-14.) In the master bedroom of the house, agents found a short-barreled rifle. Doc. 334 at 50, 58–59; Doc. 307-33. The short-barreled firearms and grenades were not registered as required by the National Firearms Act. Doc. 304 at 64–65.

The grenades were U.S. military M67 fragmentation grenades. Doc. 334

at 122. Brown had joined the military when he was 17 years old and had served in the Special Forces for 17 years. Doc. 337 at 104–05. In 2000, Brown served as the "senior weapons sergeant for the Special Forces Operational Detachment Alpha." Doc. 355 at 137. This meant that he was "the one that's primarily responsible for accountability of all the ammunition from the time they draw it out of the bunker to using it on the range, and then … any turn-in of any dummies or unspent ammunition." *Id.* at 138. That ammunition included M67 hand grenades. *Id.*

The morning after his arrest, Brown spoke to his girlfriend, Tylene Aldridge, on a recorded jail call. Gov't Ex. 105B. Aldridge told him that the agents "took eight guns, 2 uppers, grenades." *Id.* He did not respond or otherwise indicate any surprise that the agents had found grenades. *Id.* After about four seconds of silence, Aldridge continued, "Um, they had unplugged our cameras." *Id.* That elicited a response from Brown: "They unplugged them?" *Id.*

### III.  The district court denies Brown's motion to suppress and for a *Franks* hearing.

In his amended suppression motion, Brown argued that the magistrate judge in the District of Columbia lacked jurisdiction to order the search of his property in the Middle District of Florida. Doc. 186 at 5. He acknowledged

that, under Fed. R. Crim. P. 41(b)(3), a magistrate judge in a district in which domestic-terrorism activities may have occurred has the authority to issue a warrant for property outside that district. Doc. 186 at 5. But he "vigorously dispute[d] that the facts alleged in the search warrant rise to the level of probable cause that [he] was involved in any offense that meets the definition of 'domestic terrorism.'" *Id.* at 5–16.

The court said that this argument "erroneously focuse[d] on the offenses identified in the affidavit rather than the investigation of which they are a part." Doc. 196 at 5. The court explained that the affidavit "established that the search warrant application was related to the Government's investigation of the events on January 6, 2021, when a mob stormed the United States Capitol while a Joint Session of Congress convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election." *Id.* at 6. The court concluded that the affidavit established that the events on January 6 constituted acts of domestic terrorism because they "'involve[d] acts dangerous to human life' that were 'a violation of the criminal laws of the United States,'" and "'appear[ed] to be intended to influence the policy of a government by intimidation or coercion.'" *Id.* (citing 18 U.S.C. § 2331(5)(A) and (B)(ii)). As a result, the court concluded that the magistrate judge had jurisdiction to authorize the warrant. Doc. 196 at 6.

Brown also argued that the probable cause in the search-warrant affidavit was stale. Doc. 186 at 20. He claimed that the "affidavit gave the reviewing magistrate no updated information as to why law enforcement believed that nearly nine months later 'similar or other improper conduct is continuing' at his home in Florida." *Id.*

The district court rejected that argument, too. Doc. 196 at 9–12. First, the court noted that this Court has determined that a delay of around nine months—the length of the delay here—is a reasonable delay between criminal activity and a search. *Id.* at 10. The court pointed to cases in which this Court has upheld warrants based on delays ranging from nine months to two years. *Id.*

Second, the court found that "the affidavit recited facts 'indicating protracted or continuous conduct' for which 'time is of less significance.'" *Id.* at 10–11. The court pointed to facts showing that Brown and fellow Oath Keepers had planned their actions in advance and continued to discuss their actions for months afterward and that Brown continued to "seek and hoard a cache of weapons long after January 6." *Id.* at 10.

Third, the court found that it was likely that the property contained evidence of criminal activity in light of allegations that Brown recently had weapons scattered throughout. Doc. 196 at 11. The court explained that, given

that Brown had listed his house for sale, it was likely that he had moved the weapons from his house to his RV and trailer. *Id.*

Fourth, the court found that much of the evidence sought— "weapons, explosives, tactical gear, and radios—are expensive, non-disposable items," and therefore "not likely to be discarded." Doc. 196 at 11. Similarly, the court found that "messages with the Oath Keepers, which were stored on Defendant's cell phone, would not disappear unless he deleted them." *Id.* at 11–12. Thus, the court concluded that "there was a fair probability that these types of evidence would have been found during the search even 9 months after January 6—and they were." *Id.* at 12.

Finally, the court determined that "the nature and function of the premises to be searched supported an inference that the residence and vehicles would still contain evidence of weapons and explosives at the time of search." Doc. 196 at 12. The court found that "surveillance and witness statements established" that Brown's property was "still being used to store weapons, ammunition, clothing, tactical gear, and other nondisposable equipment." *Id.*

Even though the court found that no Fourth Amendment violation had occurred, it also explained that the good-faith exception to the exclusionary rule would apply.[3] Doc. 196 at 13–15. The court listed the circumstances in

_____

[3]Brown's suppression motion contained other grounds for suppression,

13

which law-enforcement officers could not rely on a warrant issued by a detached and neutral magistrate and found that none of those circumstances applied. *Id.* at 14–15. Thus, the court concluded that the "agents acted in good faith in relying on the search warrant issued by the magistrate judge" and were "justified in relying on the magistrate's determination that he had authority to issue the warrant." *Id.* at 15.

Brown also requested a *Franks* hearing to challenge the veracity of the affidavit. Doc. 186 at 23. Relevant here, he argued that the affidavit did not disclose that "[l]aw enforcement [had] conducted extensive investigation through a variety of database investigation tools," and that "[n]one of these investigatory tools revealed any evidence that Mr. Brown continued to possess evidence in the Middle District of Florida that he was involved in acts of domestic terrorism on January 6, 2021 in Washington D.C." *Id.* at 24.

The court rejected that argument out of hand: "Defendant does not, however, explain what these databases are, what evidence they were expected to uncover, or how the absence of derogatory information in these unknown databases would overcome the allegations in the search warrant affidavit or would have prevented a showing of probable cause." Doc. 196 at 17. Thus, the court concluded that Brown had "fail[ed] to meet his burden to make a

---

but we do not discuss them because he has not pursued those grounds on appeal.

14

'substantial preliminary showing' that the affidavit misrepresented or omitted any facts, let alone that any omission affected the magistrate judge's probable cause finding." *Id*. at 18.

### IV. Brown testifies at trial that he never saw the grenades and suggests that they were planted, and the prosecutor refutes those assertions by pointing to Brown's jailhouse call.

At trial, Brown testified, and he admitted that the short-barreled shotgun and rifle were his but denied any knowledge of the grenades. Doc. 337 at 141–46. In its rebuttal case, the United States introduced without objection the jail call in which Brown's girlfriend told him that the agents had found grenades. *Id*. at 223–25; Gov't Ex. 105B.

Then, in closing, the prosecutor referred to this call and said: "What's the defendant's response? Surprise? Shock? Anger? No. Silence. Silence because he wasn't surprised. He wasn't shocked. He knew he had grenades in that RV, and now he knew the search team had found it." Doc. 340 at 34. The prosecutor then played the recording for the jury and said: "Eight guns, two uppers and grenades, then silence. And we know the defendant was listening because a moment later he responds with real surprise that the security cameras had been unplugged." *Id*. at 34–35. Brown did not object.

In his closing, Brown's counsel argued that the grenades had been

15

planted. *See* Doc. 340 at 50, 51, 58, 70. He told the jury that Brown would not have exposed himself, his girlfriend, and their dogs to the risk of living with live grenades. *Id.* at 50. He then said, "I haven't been able to establish in this case why, … but I had told you the scientific evidence will show that they were planted." *Id.*

In rebuttal closing, the prosecutor reiterated without objection: "And the defendant, you heard on the jail call—he told you in his testimony that he'd never seen these grenades before. That's not the reaction of someone who is shocked to hear that grenades were found. That silence is a confession." Doc. 340 at 78–79.

### Standard of Review

I.     Because the facts are undisputed, this Court should review de novo the legality of the search warrant. *See United States v. Phillips*, 834 F.3d 1176, 1179 (11th Cir. 2016). This Court should also review de novo whether the good-faith exception to the exclusionary rule applies. *See United States v. Morales*, 987 F.3d 966, 974 (11th Cir. 2021).

II.     This Court should review for an abuse of discretion the district court's denial of Brown's motion for a *Franks* hearing. *See United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021).

III.     This Court should not review Brown's claim that the search

16

warranted lacked particularity because he affirmatively abandoned that claim below, but if it does review it, it should do so only for plain error. *See United States v. Lewis*, 492 F.3d 1219, 1221 (11th Cir. 2007). This Court "will correct a plain error when (1) an error has occurred, (2) the error was plain, and (3) the error affected substantial rights. *Id*. at 1222. "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if ... the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (internal quotation marks omitted).

IV.    This Court should review de novo Brown's claim that 26 U.S.C. § 5861(d)'s registration requirement for short-barreled shotguns and rifles facially violates the Second Amendment, *see United States v. Wilson*, 979 F.3d 889, 902 n.6 (11th Cir. 2020), but it should review only for plain error his newly raised as-applied challenge based on the registration-processing time, *see United States v. Bolatete*, 977 F.3d 1022, 1035 (11th Cir. 2020).

V.    This Court should review only for plain error Brown's claim that the prosecutor impermissibly commented on his silence because Brown did not object below to the prosecutor's statements. *See United States v. Campbell*, 223 F.3d 1286, 1288 (11th Cir. 2000).

## Summary of the Argument

I.    The district court did not err in denying Brown's suppression

17

motion. The magistrate judge in the District of Columbia had jurisdiction to issue a search warrant in the Middle District of Florida because the warrant related to an investigation of domestic terrorism that occurred in the District of Columbia—the storming of the U.S. Capitol on January 6, 2021. The probable cause in the affidavit was not stale because the evidence the United States sought—weapons, explosives, tactical gear, walkie-talkies, and radios—were expensive, non-disposable items and thus were unlikely to be discarded. And other information confirmed that Brown's house contained weapons after January 6. In any event, exclusion was unwarranted because the agents relied in good faith on the warrant.

II.    The district court did not abuse its discretion in denying Brown's motion for a *Franks* hearing. Brown alleged that the search-warrant affidavit omitted that law enforcement had conducted extensive investigation through a variety of database investigation tools and that none of those tools revealed any evidence that Brown continued to possess evidence sought in the warrant. But Brown did not explain what these databases were, what evidence they were expected to uncover, or how the lack of derogatory information in these unknown databases would have overcome the allegations in the search-warrant affidavit or would have prevented a showing of probable cause. The district court thus concluded that the omitted information was not material and

18

did not affect the magistrate judge's probable-cause finding. In doing so, the court did not apply the wrong law or make a clear error of judgment.

III.    Brown waived his claim that the search warrant was facially invalid due to a typographical error referring to Attachment B instead of Attachment E because he affirmatively abandoned that argument below. Although he included this facial-invalidity argument in his initial motion to suppress, at his request, the court struck that motion, and Brown did not include the facial-invalidity argument in his amended motion.

And even if he had not waived that claim, he has not shown that the district court plainly erred by not suppressing evidence on this ground. He points to no controlling precedent holding that this type of typographical error renders a warrant facially invalid, and persuasive authority suggests that it does not.

IV.    The NFA's registration requirement for short-barreled shotguns and rifles does not violate the Second Amendment. The Supreme Court and this Court have held that these types of weapons are not typically possessed by law-abiding citizens for lawful purposes and are thus not protected by the Second Amendment. That precedent has not been overturned or abrogated, so this Court must follow it here.

But even if this were an open question, the registration requirement does

19

not violate the Second Amendment. Short-barreled shotguns and rifles are the kind of dangerous and unusual weapons that fall outside the scope of the Second Amendment, and, in any event, the requirements to register them do not infringe on the right to bear arms. As a result, the Second Amendment does not protect Brown's conduct. And, even if it did, the registration requirement is consistent with the Nation's historical tradition of firearm regulation.

Finally, Brown's newly raised argument that the processing time to register a firearm made the statute unconstitutional as applied to him entitles him to no relief. First, Brown failed to show that the wait time prevented him from registering his firearms. Second, Brown's argument relies on extra-record information. And third, no controlling precedent establishes that the purported one-year processing time renders § 5861(d) unconstitutional under the Second Amendment. As a result, Brown has not shown plain error.

V.    Brown is not entitled to relief on his newly raised claim that the district court plainly erred by allowing the prosecutor to comment on his "silence" on a jail call with his girlfriend. To start, neither the Supreme Court nor this Court has held that the United States cannot comment on a defendant's silence during a jail call with a private party. Nor should it. The prohibition against commenting on silence stems from *Miranda*, which

20

concerns custodial interrogations by law-enforcement officers, not conversations with private parties. In any event, the record does not show that Brown was read his *Miranda* rights before the call, and this Court has held that the United States may use a defendant's post-arrest, pre-*Miranda* silence as direct evidence of a defendant's guilt. Finally, Brown has not shown that there is a reasonable probability that, but for the prosecutor's comments, the outcome would have been different. Nor can he. The prosecutor's comments merely made explicit an inference from the evidence that the jury could have drawn for itself. Plus there was ample other evidence of Brown's guilt.

## Argument and Citations of Authority

### I.    The district court did not err in denying Brown's suppression motion.

"The bulwark of Fourth Amendment protection … is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). In issuing a warrant, the "magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit …, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (internal quotation marks

omitted).

"In part to provide a remedy, the Supreme Court created the exclusionary rule, which generally prohibits the government from relying on evidence obtained in violation of the Fourth Amendment." *United States v. McCall*, 84 F.4th 1317, 1323 (11th Cir. 2023). "In practice, however, the exclusionary rule applies in only 'unusual cases.'" *Id.* "Consistent with the rule's objective of future deterrence, the Supreme Court carved out a 'good faith exception' to the exclusionary rule." *Id.* "This 'exception' has special relevance when officers act pursuant to a warrant." *Id.* "'In the ordinary case, an officer cannot be expected to question' a judge's decision that the requirements for a warrant have been satisfied or that the form of the warrant is sufficient." *Id.*

Brown argued for suppression below on the grounds that the magistrate judge in the District of Columbia lacked jurisdiction to issue the warrant to search his property located in the Middle District of Florida, that the search-warrant affidavit was based on stale information, and that the good-faith exception did not apply.[4] The district court rejected those arguments, and, on appeal, Brown has not shown that the court erred.

---

[4] Brown raised other arguments for suppression below but has abandoned them on appeal. *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1337 (11th Cir. 2022).

**A.    The magistrate judge in the District of Columbia had jurisdiction to issue the search warrant.**

Fed. R. Crim. P. 41(b)(3) states, "[A] magistrate judge—in an investigation of domestic terrorism or international terrorism—with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district." Rule 41(a)(2)(D) adopts the definition of "domestic terrorism" in 18 U.S.C. § 2331. That statute, in turn, defines "domestic terrorism" as activities that (1) "involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State"; (2) "appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping"; and (3) "occur primarily within the territorial jurisdiction of the United States." 18 U.S.C. § 2331(5). Rule 41(b)(3) authorized the magistrate judge in the District of Columbia to issue the warrant to search Brown's property.

First, the affidavit established that the events of January 6 constituted domestic terrorism occurring in the magistrate judge's jurisdiction. It showed that those events "involve[d] acts dangerous to human life" that were "a violation of the criminal laws of the United States," detailing how the rioters—carrying weapons including tire irons, sledgehammers, bear spray, and

Tasers—broke through the police lines and assaulted members of law enforcement, injuring many officers, Affidavit ¶¶ 25–29, in violation of federal laws, including 18 U.S.C. §§ 111(a), 1752, and § 5104(c)(2)(F). Second, it showed that these acts were intended to influence the United States's policy "by intimidation or coercion," by detailing how the rioters intended to stop the transfer of presidential power from one presidential administration to the next. Affidavit ¶¶ 9, 26–39. Finally, it showed that the events took place within the United States' territorial jurisdiction, specifically Washington, D.C. *Id*. ¶ 4.

Second, the search-warrant affidavit established that the search was part of the investigation into the January 6 riots. *See id*. ¶ 4. The search warrant sought evidence of violations of 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 231(a)(2) (transport of firearms or explosives for use in civil disorder; 18 U.S.C. § 844(a)(2) (transportation of explosives); and 18 U.S.C. § 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds) committed by Brown and others leading up to, during, and after the storming of the Capitol. Affidavit ¶ 2. The affidavit detailed how members of the Oath Keepers violently entered the Capitol on January 6 and explained that some had been charged with conspiring to obstruct the certification of the 2020 presidential election. *Id*. ¶¶ 49–54. It also established that Brown had coordinated with members of the Oath Keepers to travel to Washington, D.C., to conduct

24

"Close Target Reconnaissance"; that he had supplied an RV, which was loaded with a cache of firearms and ammunition; and that he had trespassed at the Capitol in "full military gear, including a helmet, radio, a tactical vest, and prominently displayed large surgical trauma shears" and had refused to leave until physically removed by law-enforcement officers. *Id.* ¶¶ 55–61.

Brown does not dispute any of this. Instead, he argues that "because the affidavit in this case failed to establish probable cause to believe that [he] was involved in any offense or 'activities' that meet the definition of 'domestic terrorism,' the magistrate judge in the District of Columbia did not have jurisdiction under Rule 41(b)(3)." Brown's brief at 24. But Rule 41(b)(3) does not require the subject of the search to have engaged in the acts of domestic terrorism. Rather, it confers jurisdiction to a magistrate judge "in an investigation of . . . terrorism," so long as any "activities related to the terrorism" occurred in the magistrate judge's district.[5] *See* Fed. R. Crim. P.

---

[5]Contrary to Brown's argument, this accords with general Fourth Amendment jurisprudence that allows for a search of a place suspected to contain evidence of criminal activity, even if the owner of the property is not suspected of any wrongdoing. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *United States v. Gibson*, 708 F.3d 1256, 1278 (11th Cir. 2013) ("[T]he Fourth Amendment does not bar the issuance of a warrant to search a third party's property if police can establish probable cause."). And, in any event, the affidavit sets forth probable cause to believe that Brown was

41(b)(3); *see also* Doc. 193 at 4–8.

**B.    The search warrant was not based on stale information.**

The staleness doctrine requires that the information supporting a search-warrant application must show that probable cause exists when the warrant issues. *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000). Courts must decide staleness by evaluating the facts of a particular case, considering "the length of time as well as the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." *Id.* at 1265 (citation and internal quotation marks omitted). "There is no particular rule or time limit for when information becomes stale." *Id.*

Applying these factors, the nine-month lapse between January 6 and the issuance of the warrant did not render the information in the affidavit stale. First, the types of evidence that the United States sought—weapons, explosives, tactical gear, walkie-talkies, and radios—were expensive, non-disposable items and based on those characteristics were unlikely to be discarded. In the child-pornography context, this Court has explained that the staleness-doctrine does not apply because "pedophiles rarely, if ever, dispose of

_____

involved with the acts of domestic terrorism committed on January 6. The affidavit explained that Brown discussed plans to travel to the Capitol with Oath Keepers, that he did so with a cache of weapons, and that he trespassed at the Capitol wearing military gear. Affidavit ¶¶ 55–61.

child pornography." *United States v. Touset*, 890 F.3d 1227, 1238 (11th Cir. 2018). Likewise, it would be unlikely for someone like Brown, who had a collection of firearms and military gear, to dispose of those expensive items. And that's especially so because Brown openly talked about being "present with Oath Keepers on January 6," and about how he had "deposited his guns with other Oath Keepers in Virginia and retrieved them after the riots." Affidavit ¶ 64. These public statements show that Brown was not trying to hide his involvement in the riots or that he had traveled with firearms. That made it less likely that he would get rid of his expensive equipment to conceal evidence.[6]

In any event, even stale information is not fatal if the affidavit updates, confirms, or corroborates it. *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994). Here, the affidavit explained that a witness confirmed that, after January 6 but before the house went on the market, Brown had "weapons scattered throughout the house." Affidavit ¶ 71. And once Brown put his house on the market, the Zillow listing showed a whiteboard listing firearms and explosives that were "on hand." *Id.* ¶ 68. This information updated and corroborated the probable cause based on the January 6 events.

---

[6]In addition, the United States sought electronic communication with other Oath Keepers, which, even if deleted, could still be recovered. *See Touset*, 890 F.3d at 1238 ("Deleted files can remain on electronic devices.").

**C.     The good-faith exception to the exclusionary rule applies.**

Even if the magistrate judge should not have issued the warrant, Brown still would not be entitled to suppression of the evidence. Under the good-faith exception, "exclusion is not warranted when police act 'in objectively reasonable reliance' on a subsequently invalidated search warrant—in other words, when they act in good faith." *United States v. Taylor*, 935 F.3d 1279, 1289 (11th Cir. 2019). This exception applies when "officers reasonably relied on a warrant that was later deemed invalid for lack of probable cause," and when "officers reasonably rely on a warrant later determined to have been void *ab initio*" because the magistrate judge lacked authorization to issue the warrant, *id.* at 1289, 1291.

"The good faith exception 'applies in all but four limited sets of circumstances.'" *United States v. Morales*, 987 F.3d 966, 974 (11th Cir. 2021). Those are where: (1) the magistrate judge "issuing the warrant was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the issuing magistrate judge "wholly abandoned his judicial role;" (3) the supporting affidavit "is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) based on the facts of the particular case, "a warrant is so facially deficient that the executing officers cannot

28

reasonably presume it to be valid." *Id*. The district court found that none of

these exceptions applied, Doc. 196 at 15, and Brown has failed to show that

the court erred.

First, the court correctly determined that "the agents were justified in

relying on the magistrate's determination that he had authority to issue the

warrant." *See* Doc. 196 at 15. In footnote nine of his brief, Brown argues that

the agents knew or should have known that the magistrate judge's jurisdiction

required a showing that Brown was involved in acts of domestic terrorism. But

that is legal argument, and, once the agents had disclosed the relevant facts,

they were entitled to rely on the magistrate judge's determination about the

law. *See Taylor*, 935 F.3d at 1290 ("The exclusionary rule is concerned with

deterring *officer* misconduct and punishing *officer* culpability—not with setting

judges straight.") (emphasis this Court's). Even if the magistrate judge were

wrong—he was not, *see* pages 23–25—the error would not have been so

glaringly obvious as to render a law-enforcement officer's reliance on the

warrant unreasonable. *See McCall*, 84 F.4th at 1325 (11th Cir. 2023) ("[T]he

good faith exception applies to close calls and threshold cases.").

Similarly, the district court correctly determined that the agents acted in

good faith in relying on the magistrate judge's probable-cause determination,

even if the probable cause were stale. *See* Doc. 196 at 15. Brown claims only

29

that "the law enforcement officers knew or should have known that the information contained in the affidavit was stale." Brown's brief at 29. But that's not enough. He had to show that the affidavit contained information "the applicant knew was false or would have known was false but for a reckless disregard of the truth" or that the affidavit "was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Taylor*, 935 F.3d at 1279 (internal quotation marks omitted). He did not even try to make that showing.

Nor can he. As to the former, the affidavit did not contain any information that was false or that the applicant should have known was false. As to the latter, "[t]o exclude evidence on this ground, the affidavit must be so clearly insufficient that it provided no hint as to why police believed they would find incriminating evidence." *McCall*, 84 F.4th at 1325 (internal quotation marks omitted). As discussed above, the affidavit provided more than a hint about why evidence related to the January 6 riots would still be found in Brown's property nine months later. So it cannot be said that the "no officer of reasonable competence would have requested the warrant," and it was thus not unreasonable for the officers to have relied on the warrant issued here. *See id.* at 1325.

For these reasons, the district court did not err in concluding that the

magistrate judge had jurisdiction to issue the warrant, that the probable cause in the warrant affidavit was not stale, and that, in any event, the good-faith exception to the exclusionary rule applied. This Court should affirm the district court's denial of Brown's suppression motion.

## II.   The district court did not abuse its discretion in denying Brown's motion for a *Franks* hearing.

To be entitled to a *Franks* hearing, a defendant must make a "substantial preliminary showing" establishing: (1) that the affiant deliberately or recklessly included a false statement, or failed to include material information, in the warrant affidavit; and (2) that the allegedly false statement or omission was necessary to the finding of probable cause. *Id.*, 438 U.S. at 155–56. The defendant bears the burden of showing that the omissions would defeat a probable cause determination. *Id.* at 171. The defendant's attack "must be more than conclusory." *Id.*

Brown did not meet his burden in the district court. In his motion, Brown pointed to a statement in an incident summary: "Between 31 March 2021 and 5 April 2021, queries of these selectors were conducted through [online databases]. To the extent that derogatory information is not referenced above, results in these databases were negative for additional derogatory

information."[7] Doc. 189, Ex. H. He argued, "None of these investigatory tools revealed any evidence that [he] continued to possess evidence in the Middle District of Florida that he was involved in acts of domestic terrorism on January 6, 2021 in Washington, D.C." Doc. 189 at 24.

The district court found that statement insufficient to meet Brown's burden because it did not "explain what these databases are, what evidence they were expected to uncover, or how the absence of derogatory information in these unknown databases would overcome the allegations in the search warrant affidavit or would have prevented a showing or probable cause." Doc. 196 at 17. Thus, the court concluded that Brown had "fail[ed] to meet his burden to make a 'substantial preliminary showing' that the affidavit misrepresented or omitted any facts, let alone that any omission affected the magistrate judge's probable cause finding." *Id*. at 18.

The court acted well within its discretion. *See United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) ("The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach."). That law-enforcement officers did not find *additional* evidence of wrongdoing does not negate the evidence of probable cause in the warrant

---

[7]In the district court, Brown asserted other grounds for a *Franks* hearing, but he did not challenge the district courts denial of his motion on those grounds and has therefore abandoned them. *See Carrizosa*, 47 F.4th at 1337.

application, nor does it suggest that the magistrate judge would have declined to issue the warrant had he had that information.

Brown has not shown otherwise. He argues that in deciding to approve the search warrant, "the issuing magistrate judge would obviously want to know about any other investigations that law enforcement officials had conducted related to [him]." Brown's brief at 31. But the district court concluded that Brown had failed to meet his burden of showing that this omission was material and affected the magistrate judge's probable-cause finding, and Brown has failed to show that the court made a clear error of judgment or applied the wrong legal standard, as required to show an abuse of discretion. *See Frazier*, 387 F.3d at 1259. Thus, this Court should affirm the district court's denial of Brown's motion for a *Franks* hearing.

### III. Brown waived his claim that the search warrant was facially invalid due to a typographical error that referred to Attachment B instead of Attachment E by affirmatively abandoning that argument below, and, even if he did not, he has not shown that the district court plainly erred by not suppressing the evidence on that ground.

The "particularity requirement" of the Fourth Amendment is to prevent "general, exploratory rummaging in a person's belongings." *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (internal quotation marks and citation omitted). In determining whether a warrant describes property with

33

particularity, courts can consider documents incorporated into a warrant by reference or attached to and accompanying the warrant. *Id.* at 1350–51 & n.6; *see also United States v. Weinstein*, 762 F.2d 1522, 1531 (11th Cir. 1995) ("[A]n affidavit incorporated into a warrant by express reference and attached to and accompanying the warrant can cure ambiguity in the warrant itself.").

The search warrant for Brown's property had five attachments: Attachments A–D, described the places and property to be searched, and Attachment E, labeled "Property to be seized," described the property to be seized. Doc. 193, Ex. 1 (warrant). But the warrant contained a typographical error. Rather than stating "Attachment E" in the space set aside for a description of the items to be seized, the warrant stated "Attachment B." *Id.* Seizing on that typographical error, Brown argues that the warrant was facially invalid. Brown's brief at 14–19. This newly raised claim entitles him to no relief.

To start, this Court should not review Brown's claim because he waived it. "[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir.) (en banc), *cert. denied*, 143 S. Ct. 95 (2022). The Tenth Circuit has described as the "classic waiver situation" the circumstance "where a party actually identified the issue, deliberately considered it, and then affirmatively acted in a manner that

34

abandoned any claim on the issue." *United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1185 (10th Cir. 2009) (internal quotation marks omitted).

Brown did exactly that here. His initial motion to suppress included the facial-invalidity argument he now makes, Doc. 121, but he withdrew that motion so that he could file an amended motion, Doc. 126. He then chose not to include the facial-invalidity argument in that amended motion. Doc. 186. By choosing not to do so, Brown did not simply forfeit his claim by failing to raise it—he waived it. *See United States v. Horsfall*, 552 F.3d 1275, 1283–84 (11th Cir. 2008) (concluding that defense counsel's affirmative withdrawal of an objection to the PSR at sentencing precluded this Court from reviewing that argument on appeal). Because Brown waived this claim, this Court should not consider it, even under plain-error review.[8] *See United States v. Lewis*, 492 F.3d

---

[8]Prior to the revision of Fed. R. Crim. P. 12 in 2014, this Court would have considered this argument waived because Brown did not show good cause for failing to bring this claim before the district court. *See United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013) ("Because Defendant waived this argument under Rule 12(e), we need only examine whether good cause would support relief from the waiver."). But this Court has held that, under the current version of Rule 12, a claim required to be raised pretrial under Rule 12(b)(3), such as a suppression claim, is subject to review for plain error even if the defendant "does not show 'good cause' for failing to present the claim before trial," *United States v. Sperrazza*, 804 F.3d 1113, 1119 (11th Cir. 2015), although this Court has continued to apply the good-cause standard to suppression issues not raised in the district court, *see, e.g.*, *United States v. Miller*, No. 20-10194, 2023 WL 155212, at *2 (11th Cir. Jan. 11, 2023); *United States v. Rivera*, 824 F. App'x 930, 935 (11th Cir. 2020); *United States v. Russa*, 807 F.

1219, 1221 (11th Cir. 2007) ("[W]hile forfeited claims are reviewed under Rule 52(b) for plain error, waived claims are not.").

In any event, plain-error review makes short work of Brown's argument. Brown had the burden of showing an error that is clear and obvious under current law, which requires identifying controlling precedent establishing the error. *See United States v. Laines*, 69 F.4th 1221, 1234 (11th Cir. 2023). He has not done so. He does not dispute that Attachment E describes the property to be seized with particularity. That the warrant said Attachment B instead of Attachment E was a typographical error. *See United States v. Qazah*, 810 F.3d 879, 886 (4th Cir. 2015) (classifying the mistake of including an incorrect attachment in a search warrant as "technical" in nature). Nothing in the record suggests that the magistrate judge or the searching agents relied on Attachment B instead of Attachment E when determining what items could be seized. Indeed, Attachment B is labeled "PREMISES TO BE SEARCHED," while Attachment E is labeled, "Property to be seized," thus clearing up any confusion about what could be seized under the warrant. Brown has identified no controlling precedent establishing that this type of typographical error violates the Fourth Amendment's particularity requirements.

Contrary to Brown's argument on pages 16–19, *Groh v. Ramirez*, 540

_____

App'x 990, 995 (11th Cir. 2020).

U.S. 551 (2004), does not establish plain error, or error at all. In *Groh*, the Court held that a warrant that stated, in the space set aside for a description of the items to be seized, "that the items consisted of a 'single dwelling residence ... blue in color.'" *Id.* at 558. The Court held that because "the warrant did not describe the items to be seized at all[,] … the warrant was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law." *Id*. But *Groh* did not deal with "what fairly could be characterized as a mere technical mistake or typographical error," nor did it address the propriety of incorporating into the warrant documents by reference. *Id*. So *Groh* does not establish plain error.

Indeed, post-*Groh*, this Court, in denying a certificate of appealability, rejected the argument that this type of error renders a warrant facially invalid. *Hawkins v. United States*, 2016 WL 9528784, at *4 (11th Cir. Dec. 9, 2016). In *Hawkins*, the search warrant contained a "technical error" because it "incorporated Attachment A, rather than Attachment B, for a description of the items to be seized." *Id*. at *2 "Hawkins claimed that he received ineffective assistance because his trial counsel did not advise him that the search warrant issued in his case failed to comply with the requirements of the particularity clause of the Fourth Amendment, and counsel failed to move to suppress the evidence seized based on the flawed warrant." *Id*. This Court explained that,

37

"while the warrant did not refer to Attachment B as the list of items to be seized, instead incorrectly referring to Attachment A, the warrant was nevertheless valid because Attachment B was attached to the warrant and accompanied it at the time of its execution." *Id*. at *4.

Other Circuits agree that these types of drafting errors do not invalidate a warrant. The Sixth Circuit explained: "We have consistently found that inadvertent drafting mistakes … do not violate the Fourth Amendment's prohibition on unreasonable searches and seizures. That is because those errors create little risk of a mistaken search or a general warrant granting police an unconstitutionally broad authority to conduct searches." *United States v. Abdalla*, 972 F.3d 838, 841 (6th Cir. 2020); *accord United States v. Waker*, 534 F.3d 168, 172 (2d Cir. 2008) (joining with other circuits "in finding that minor clerical errors generally are not fatal to a search warrant"; collecting cases).

To reiterate, this Court should not review Brown's claim that the warrant was facially invalid because he waived it by affirmatively abandoning it in the district court. But if this Court does review it, it should find that the district court did not err, let alone plainly err, by failing to conclude unprompted that the typographical error rendered the search warrant facially invalid.

### IV.   The NFA's registration requirement for short-barreled shotguns and rifles does not violate the Second Amendment.

Brown challenges on Second Amendment grounds his conviction under the NFA for possession of an unregistered short-barreled shotgun and rifle.[9] The relevant part of the NFA states, ""It shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). The NFA defines "firearm" to include "a shotgun having a barrel or barrels of less than 18 inches in length" and "a rifle having a barrel or barrels of less than 16 inches in length," 26 U.S.C.§ 5845(a), often referred to as short-barreled shotguns and rifles. Registering a firearm requires the payment of a $200 tax; identification of the firearm to be registered; and identification of the applicant—including fingerprints and a photograph. 26 U.S.C. §§ 5811, 5812, 5821, 5822.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008), the Supreme Court held that the Second Amendment's right to keep

---

[9]Brown states that he has relied on the motion filed by the defendant in *United States v. Miller*, No. 3:23-cr-41 (N.D. Tex.), so it's worth noting that the district court in that case rejected the defendant's arguments, *id.*, 2023 WL 6300581 (N.D. Tex. Sept. 27, 2023).

and bear arms protects an individual's right to possess and use a firearm for lawful purposes, such as self-defense within the home. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022), the Court held that the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home."

**A.    Controlling precedent forecloses Brown's challenge to his § 5861(d) convictions for possession of an unregistered short-barreled shotgun and rifle.**

It is well established that the Second Amendment does not protect the possession of short-barreled shotguns and rifles. Brown concedes as much: "Undersigned counsel acknowledges that the Supreme Court has previously held that short-barreled shotguns/rifles do not fall within the scope of the Second Amendment's protection."[10] Brown's brief at 38–39.

That concession is warranted. In *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court considered a Second Amendment challenge to the NFA brought by defendants indicted for transporting an unregistered short-barreled shotgun. Rejecting the challenge, the Court held that absent "any evidence tending to show that possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a

---

[10]Brown treats short-barreled shotguns and rifles interchangeably. We do too.

40

well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* at 178.

Then, in *Heller*, while rejecting that *Miller* limited the protection of the Second Amendment to those serving in a militia, the Court embraced *Miller*'s limitation of the types of weapons covered by the Second Amendment, stating that it "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 621–25. That reading, the Court explained, "accords with the historical understanding of the scope of the right." *Id.* at 625. And post-*Heller*, this Court relied on *Miller* to reject as "frivolous" a Second Amendment challenge to a conviction for possessing an unregistered, short-barreled shotgun. *United States v. Wilson*, 979 F.3d 889, 903 (11th Cir. 2020).

Contrary to Brown's suggestion, *Bruen* does not allow this Court to revisit this precedent. He contends that *Bruen* held that weapons commonly used for self-defense fall within the scope of the Second Amendment, but that, in *Miller*, the Supreme Court was not considering how short-barreled shotguns could be used for self-defense. Brown's brief at 39. That argument contains multiple flawed premises.

First, Brown wrongly suggests that *Bruen* was the first time the Supreme

41

Court held that weapons commonly used for self-defense fall within the scope of the Second Amendment. It was *Heller*, not *Bruen*, that first articulated the self-defense standard in determining that the Second Amendment conferred an individual right. *See Heller*, 554 U.S. at 628 (explaining that "the inherent right of self-defense has been central to the Second Amendment right"). And, in doing so, *Heller* explicitly endorsed *Miller*'s exclusion of short-barreled shotguns from the Second Amendment's ambit. *Heller*, 554 U.S. at 625. *Bruen* did not reject *Heller*; it just "made the constitutional standard endorsed in *Heller* more explicit." *See Bruen*, 597 U.S. at 31. This Court cannot cut back on *Heller* and *Miller* when *Bruen* did not. *See United States v. Johnson*, 921 F.3d 991, 1002 (11th Cir. 2019) ("The only Court that can properly cut back on Supreme Court decisions is the Supreme Court itself.").

Second, *Miller* did consider whether short-barreled shotguns were commonly used in self-defense. The *Miller* Court explained that militia men "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.*, 307 U.S. at 179. It follows that, by determining that short-barreled shotguns were not "any part of the ordinary military equipment," *id.* at 178, the Court necessarily determined that those weapons were not in ordinary use for self-defense.

But even if *Miller* did not consider whether short-barreled shotguns were

commonly used for self-defense, *Heller* did—rejecting that they were so used. *Id.*, 554 U.S. at 625. In interpreting what types of weapons *Miller* permits, *Heller* noted that "weapons used by militiamen and weapons used in defense of person and home were one and the same." *Heller*, 554 U.S. at 625 (internal quotation marks omitted). Thus, the *Heller* Court reaffirmed that weapons such as "short-barreled shotguns" are "not typically possessed by law-abiding citizens for lawful purposes" and are thus not protected by the Second Amendment. *Id*.

In any case, Brown's argument ignores *Wilson*, which, post-*Heller*, continued to rely on *Miller* to hold that the Second Amendment does not guarantee the right to possess an unregistered short-barreled shotgun. *Wilson*, 979 F.3d at 903. Under this Court's prior-precedent rule, this Court must follow the precedent of earlier panels until the prior precedent is overruled or undermined to the point of abrogation by the Supreme Court or this Court sitting en banc. *United States v. Johnson*, 981 F.3d 1171, 1192 (11th Cir. 2020). To "fully undermine a prior panel decision, the later Supreme Court decision must demolish and eviscerate each of its fundamental props." *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir.) (internal quotation marks and alterations omitted), *cert. denied* 143 S. Ct. 486 (2022). *Bruen* expressly endorsed *Miller* and *Heller*, *see id.* at 21, *see also id.* at 51 (Kavanaugh,

J., concurring), and thus does not undercut *Wilson*'s reliance on *Miller*.

Simply put, Brown's argument runs headfirst into a wall of precedent—both from the Supreme Court and this Court—holding that short-barreled shotguns are not protected by the Second Amendment. *Bruen* had no effect on that precedent, so this Court is bound by it. This Court need look no further.

**B.  Even if this Court were to look at this issue anew, § 5861(d)'s prohibition on unregistered short-barreled shotguns and rifles passes constitutional muster under the *Bruen* framework.**

*Bruen* reiterated that there is no "'right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id.*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). Rather, *Bruen* articulated the following standard for applying the Second Amendment: first, "[i]n keeping with *Heller*, … when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; and, second, if a challenged regulation burdens such presumptively protected conduct, the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Brown's challenge fails at both steps.

***(1)   The Second Amendment does not cover the possession of unregistered short-barreled shotguns and rifles.***

To determine whether the Second Amendment's plain text covers an

individual's conduct, this Court must determine whether the challenger is "part of 'the people' whom the Second Amendment protects," whether the weapon at issue is "'in common use' today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment. *Bruen*, 597 U.S. at 31–32. Brown, at the time of his offense, was part of the people, but unregistered short-barreled shotguns and rifles are not in common use today for self-defense and his course of conduct—possessing an *unregistered* short-barreled shotgun and rifle—falls outside the Second Amendment. Thus, the Second Amendment does not protect Brown's conduct.

Starting with the in-common-use requirement, the Supreme Court has recognized that short-barreled shotguns are not "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Circuit courts have too. *See, e.g.*, *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) ("It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used."). Instead, these types of weapons are the types of "dangerous and unusual" weapons that have been traditionally prohibited. *See, e.g.*, *Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023) ("[T]he NFA was designed to target 'gangster-type weapons' that are 'especially dangerous and

45

unusual.'"); *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018) (noting that a long gun with a shortened barreled is both dangerous, because "its concealability fosters its use in illicit activity," and unusual, "because of its heightened capability to cause damage").

Brown's arguments to the contrary fail. He argues that short-barreled shotguns were not considered "dangerous and unusual" at the time of the enactment of the Second Amendment, pointing to the blunderbuss. Brown's brief at 42. But that is not the appropriate inquiry; the inquiry is whether a weapon is dangerous and unusual *today*. *See Bruen*, 597 U.S. at 5 (analyzing whether handguns are in common use for self-defense today). And, in any event, the blunderbuss is not an accurate comparator to a short-barreled shotgun or rifle. *See Miller*, 2023 WL 6300581, at *4. Brown also points to an ATF website showing the number of registered short-barreled shotguns and rifles in the United States in 2021 to argue that those firearms should not be considered dangerous and unusual. *See* Brown's brief at 43. But he did not present this data to the district court, and this Court cannot consider facts outside the record.[11] *See Turner v. Burnside*, 541 F.3d 1077, 1086 (11th Cir.

---

[11]In any event, those statistics do not establish that these types of weapons are commonly used for self-defense. For example, they do not establish that those registered weapons are possessed by individuals, let alone possessed for self-defense. Nor do they show how the number of short-barreled

2008) ("We do not consider facts outside the record."). So Brown has not shown that short-barreled shotguns and rifles are in common use today for self-defense.

Turning to the proposed-course-of-conduct requirement, the NFA does not prohibit the possession of short-barreled shotguns or rifles; it prohibits only their *unregistered* possession. The plain text of the Second Amendment does not say that the right to keep and bear arms cannot be "burdened in any way," but that it shall not be "infringed." Administrative burdens that stop far short of disarming law-abiding citizens do not "infringe" the right to keep and bear arms. *See* Webster's American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder").

Indeed, *Heller* and *Bruen* make clear that, while the government cannot *prohibit* the in-home possession and public carrying of firearms for self-defense purposes, "the Second Amendment allows a 'variety' of gun regulations." *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring); *see also id.* at 72 (Alito, J., concurring) ("Our holding decides nothing about … the requirements that must be met to buy a gun. … Nor have we disturbed anything that we said in

---

shotguns and rifles compares to the number that existed at the time of *Miller* or *Heller*.

*Heller* … about restrictions that may be imposed on the possession or carrying of guns."). Likewise, *Bruen* expressly left undisturbed the "shall-issue" licensing laws in 43 states. *Id.* at 38, n.9. And Justice Kavanaugh's concurrence emphasized that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 90. The NFA imposes requirements akin to those of "shall-issue" licenses.

For these reasons, the Second Amendment does not protect Brown's conduct. This Court may stop here.

### (2)    *The NFA's registration requirement for short-barreled shotguns and rifles is consistent with the Nation's historical tradition of firearm regulation.*

If this Court does proceed to the second step of the *Bruen* analysis, however, is should find that § 5861(d) satisfies that step, too. To start, in *Miller*, the Supreme Court engaged in historical analysis demonstrating the Nation's history of regulating the permissible length of firearms in the context of the militia. *See id.*, 307 U.S. at 180 ("The musketeer should carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length"; "Every officer and soldier shall appear … armed … with a good, clean musket … three feet eight inches long

in the barrel").

More broadly, "colonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 Law & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." *Id.* at 685 n.18. And other colonial governments "controlled the conditions of trade" in firearms. *Id.* at 685.

Like these early laws, the NFA's registration requirements for short-barreled shotguns and rifles do not prohibit possessing them. Instead, the statute imposes record-keeping and payment requirements to document the firearms. Although the statutes are not identical to those historical regulations, *Bruen* explained that the government need only identify a "historical *analogue*, not a historical *twin*." *Id.*, 597 U.S. at 30. In this case, the practice of the colonies of regulating commerce in firearms provides an acceptable historical

49

analog.

**(3)**    *Brown's argument—raised for the first time on appeal—based on the registration-processing time does not withstand plain-error review.*

Brown recognizes that the NFA does not prohibit the possession of short-barreled rifles and shotguns but requires only that they be taxed and registered. Still, he now argues that the wait time for processing the registration renders the requirement unconstitutional under the Second Amendment. Brown's brief at 44–45. That argument does not withstand scrutiny.

To begin with, plain-error review applies. Brown never presented this as-applied challenge to the statute to the district court. The sum of his argument below was that the firearms at issue were "shorter than the legal shotguns, but longer than, say, a pistol or handgun, that is an unconstitutional law, and the Second Amendment wasn't designed for that." Doc. 337 at 36. Nothing about that argument would have apprised the district court that Brown believed that processing time violated the Second Amendment. Thus, plain-error review applies. *See United States v. Bolatete*, 977 F.3d 1022, 1035 (11th Cir. 2020) ("Constitutional challenges are not all-encompassing, they are not interchangeable, and one does not serve as a placeholder for others. Attacking a statute on one ground in the district court does not entitle a litigant to de novo review of an attack on another ground in a court of appeals.").

Brown has failed to show any error, let alone plain error. In *Bolatete*, this

50

Court rejected an as-applied challenge to the constitutionality of the NFA because the evidence established that "Bolatete would not have registered the silencer he bought, even if he could have." *Id*. at 1034. "As a result," this Court reasoned, Bolatete could not "defeat the Act's application to him on the ground that he never had a chance to register the silencer that he would not have registered anyway or to pay the transfer tax that he would not have paid anyway." *Id.* So too here. The record contains no evidence that Brown intended to register his short-barreled shotgun and rifle, let alone that he'd tried and found the wait time unbearable. To the contrary, Brown testified at trial that he knew that "for $200" he could have applied to register his short-barreled rifle, but he said nothing about the wait time. *See* Doc. 337 at 168.

In addition, Brown cannot show plain error because the record does not establish the registration-processing time. On appeal, Brown improperly relies on extra-record facts to try to establish the processing time for registering a firearm. *See* Brown's brief at 44–45 (directing this Court to ATF's website). Because no facts support the processing time or that Brown otherwise intended to register his firearms, Brown cannot meet his burden of showing plain error. *See United States v. Meadows*, 523 F.2d 365, 368 (5th Cir. 1975) (this Court can find plain error "only if the facts in the record compel the conclusion").

Even if this Court considered this extra-record material, however, that

51

material does not show that the district court plainly erred. The website Brown points to shows only the anticipated processing time as of October 23, 2023, long after Brown was convicted for the firearm offenses. Thus, those statistics say nothing about the time it would have taken to process Brown's registration when Brown obtained the short-barreled firearms at issue.

Finally, Brown has failed to show that the purported error is plain under controlling precedent. Although the Supreme Court did not "rule out" the possibility of Second Amendment challenges based on a long wait time, it has not affirmatively held that such challenges could be made or addressed what would constitute a sufficiently long waiting period to violate the Second Amendment. And Brown points to no controlling precedent establishing that a year's wait time constitutes an actionable delay under the Second Amendment. As a result, he has failed to show plain error.

In sum, § 5861(d)'s prohibition on unregistered short-barreled shotguns and rifles does not violate the Second Amendment under this Court's precedent or under *Bruen*'s two-step framework, and Brown's as-applied challenge based on the processing time to register does not withstand plain-error review. The Second Amendment entitles him to no relief from his unregistered-firearms convictions.

**V.    Brown is not entitled to relief on his claim that the district court plainly erred by allowing the prosecutor to comment on his "silence" on a jail call with his girlfriend.**

For the first time on appeal, Brown, citing *Doyle v. Ohio*, 426 U.S. 610, (1976), argues that the prosecutor violated his due-process right by commenting on his silence during a jail call in response to his girlfriend's telling him that grenades had been found during the search. Brown's brief at 46–50. In *Doyle*, the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 619. But *Doyle* does not apply here—plainly or otherwise—for two reasons.

First, *Doyle* does not apply—and certainly does not plainly apply—to Brown's silence on a jail call with his girlfriend. *Doyle* involved the State's commenting on the defendant's silence to law enforcement. The only cases that Brown cites in support of extending *Doyle* into the private-party context are an unpublished opinion from a magistrate judge in the Central District of California and a California appellate court decision. Brown's brief at 48–49. That does not establish plain error. *See United States v. Fey*, No. 22-11373, 2023 WL 8946234, at *8 (11th Cir. Dec. 28, 2023) (published) ("[A]n error is plain

only if binding precedent resolves the issue."). And in any event, the *Doyle* rule stems from *Miranda*, *see Doyle*, 426 U.S. at 618, so it makes no sense to extend *Doyle* into contexts—such as jail calls with third parties—that do not amount to interrogation for Fifth Amendment purposes. *See, e.g.*, *United States v. Stubbs*, 944 F.2d 828, 832 (11th Cir. 1991).

Second, even if *Doyle* did apply to third-party conversations, it still would not apply here because the record does not show that Brown had received *Miranda* warnings before that phone call. This Court has held that "the government may use a defendant's post-arrest, pre-*Miranda* silence as direct evidence tending to prove the defendant's guilt." *United States v. Cabezas-Montano*, 949 F.3d 567, 595 (11th Cir. 2020). Nothing in the record suggests that Brown had received *Miranda* warnings, so this Court cannot find a *Doyle* violation. *See United States v. O'Keefe*, 461 F.3d 1338, 1347 (11th Cir. 2006) ("Because there can be no *Doyle* violation until after a person is given *Miranda* warnings and the assurances implicit therein, and there is no evidence before us which indicates that [the defendant] received such warnings, we conclude that no *Doyle* violation occurred in this case."). Thus, Brown has shown no error, let alone plain error.

Finally, even if Brown had shown plain error, he has failed to show that the error affected his substantial rights. To make this showing, he has the

54

difficult burden of showing that there was reasonable probability of a different result but for the prosecutor's commenting on his silence. *See Greer v. United States*, 141 S. Ct. 2090, 2096 (2021). Brown has not even tried to meet that burden. Instead, he asserts in a single sentence, "The prosecutor's actions clearly affected [his] substantial rights (i.e. his Fifth And Fourteenth Amendment rights)—as the Government specifically argued to the jury that [his] 'silence is a confession.'" Brown's brief at 50. But that argument collapses the third prong of plain-error review into the first and second by simply asserting that because there was an error, that error affected his substantial rights. In other words, he contends that he is entitled to relief under plain-error review simply because there was a constitutional error when the prosecutor made the "silence is a confession" statement in closing. But "the 'general rule' is that 'a constitutional error does not automatically require reversal of a conviction'"; a defendant is entitled to reversal on plain-error review only if he "has carried the burden of showing a 'reasonable probability' that the outcome of the district court proceeding would have been different." *Greer*, 141 S. Ct. at 2099–2100. Brown has not carried that burden.

Nor can he. In *United States v. Campbell*, 223 F.3d 1286, 1290 (11th Cir. 2000), the defendant complained that, "in closing, the Government highlighted his failure to deny ownership or knowledge of the cocaine." This Court

concluded that "because the Government simply made explicit an inference that the jury could have drawn from the evidence, Campbell has not shown that his substantial rights were affected." *Id*. Similarly, the prosecutor's statements that Brown's silence showed that he was not surprised that grenades were found in his RV just made explicit an inference the jury could have drawn from hearing the jail call. In addition, given the ample evidence that Brown had knowingly possessed the grenades, *see Statement of Facts § II*, Brown cannot show that the purported error affected his substantial rights. *See United States v. Wilchcombe*, 838 F.3d 1179, 1191 (11th Cir. 2016) (any error caused by the United States' comment on defendant's pre-*Miranda* silence would not warrant reversal "in light of the ample evidence of his guilt that was presented at trial").

Because Brown has failed to show plain error affecting his substantial rights, he is not entitled to relief based on the prosecutor's comments, which were not improper in any event.

## Conclusion

The United States requests that this Court affirm the judgment of the district court.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

By:  *s/ Holly L. Gershow*
HOLLY L. GERSHOW
Assistant United States Attorney
Deputy Chief, Appellate Division
Florida Bar No. 98960
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
holly.gershow@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 12,833 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

# Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was

sent by CM/ECF on January 16, 2024, to:

MICHAEL UFFERMAN, ESQ.
*Counsel for Jeremy Brown*

*s/ Holly L. Gershow*
HOLLY L. GERSHOW
Assistant United States Attorney